222 F.3d 951 (Fed. Cir. 2000)
 HOCKERSON-HALBERSTADT, INC., Plaintiff/Counterclaim Defendant- Appellant, and AMERICAN SPORTING GOODS CORP., Counterclaim Defendant,
v.
AVIA GROUP INTERNATIONAL, INC., Defendant/Counterclaimant-Appellee, and REEBOK INTERNATIONAL, LTD., Defendant-Appellee.
 99-1505
 United States Court of Appeals for the Federal Circuit
 DECIDED: July 27, 2000
 
 Appealed from: United States District Court for the Northern District of California Senior Judge D. Lowell JensenRichard E. Backus, Flehr Horbach Test Albritton & Herbert LLP, of San Francisco, California, argued for plaintiff/counterclaim defendant-appellant. With him on the brief was Todd A. Lorenz.
 David K.S. Cornwell, Sterne, Kessler, Goldstein & Fox, P.L.L.C., of Washington, DC, argued for defendant/counterclaimant-appellee. With him on the brief were Linda E. Alcorn, and Albert L. Ferro. Of counsel on the brief was D. Peter Harvey, Mussman & Harvey L.L.P., of San Francisco, California.
 Before MAYER, Chief Judge, CLEVENGER and GAJARSA, Circuit Judges.
 GAJARSA, Circuit Judge.
 
 
 1
 Hockerson-Halberstadt, Inc. ("HHI") sued Avia Group International, Inc. ("Avia") for infringement of U.S. Patent No. 4,259,792 ("the '792 patent"), covering an article of outer footwear, in the United States District Court for the Northern District of California. Following the district court's claim construction, the parties entered into a proposed order in which HHI stipulated to non-infringement and agreed to dismiss its claims with prejudice, and Avia agreed to dismiss its counterclaims without prejudice. The district court entered final judgment based on that order, and HHI appealed the court's claim construction. Because the district court correctly construed the claims, we affirm.
 
 BACKGROUND
 
 2
 The '792 patent relates to the field of footwear, particularly athletic shoes, having a heel that is bisected by a central groove creating two peripheral fins. The central groove and double fin structure provides the user with a cushioning effect by distributing the downward force of footfall over a wide area of the heel. The figure below depicts a bottom view of one embodiment of the '792 patent, in which 72 and 74 are the fins and 70 is the groove.
 
 
 3
 [Tabular or Graphical Material Omitted]
 
 
 4
 Claim 1 of the '792 patent, representative of the other claims, provides as follows:
 
 
 5
 An article of outer footwear comprising [1] a footwear upper attached to a footwear base,
 
 
 6
 [2] said footwear base including a sole part and a heel part,
 
 
 7
 [3] said heel part having an upper surface on which the weight of a person's foot will press and a lower surface adapted to contact the ground, the area of the lower surface being greater than the area of the upper surface,
 
 
 8
 [4] said lower surface extending outside vertical planes passing through the upper surface at the periphery of the upper surface on both sides of the heel and behind the heel;
 
 
 9
 [5] a peripheral ridge extending upwardly from the upper surface on which the weight of the person's foot will press,
 
 
 10
 [6] said peripheral ridge being positioned to form along its inside surface an upwardly extending support for the sides and back of the person's heel,
 
 
 11
 [7] said peripheral ridge having its outer surface flaring outwardly on both sides of the heel part and behind the heel part from the top of the ridge to the lower surface of the heel part,
 
 
 12
 [8] said ridge also being attached on its inner surface to the footwear upper; and a central longitudinal groove in the underside of the heel part extending forwardly through the heel part into the underside of the sole part to divide the lower surface of the heel part into a pair of fins which are capable of bending outwardly and upwardly when the underside of the heel part strikes the ground. [numbering added]
 
 
 13
 During prosecution of the '792 patent application, the Patent and Trademark Office ("PTO") examiner rejected all the original claims under 35 U.S.C. § 103 as obvious in light of U.S. Patent No. 3,100,354 ("the Lombard patent") and U.S. Patent No. 4,128,950 ("the Bowerman patent"). In particular, the Lombard patent taught a shoe in which the "bottom width of the channel is greater than the combined width of the rims."[1] In response to the rejection, the inventor canceled the original claims and replaced them with three new independent claims, all of which contained the term "central longitudinal groove." The inventor also made various arguments to distinguish the new claims from the prior art. In one of his arguments, the inventor submitted drawings comparing the claimed invention with a hypothetical combination of the Lombard and Bowerman patents. The drawings, with the claimed invention on the right (figures 12B and 16B) and the hypothetical combination on the left (figures 12A and 16A), depicted the following:[Tabular or Graphical Material Omitted]
 
 
 14
 Pursuant to these drawings, the inventor argued that "[a]pplicant is providing a much narrower groove for a totally different purpose, namely to provide fins which can be compressed outwardly and upwardly. Such fins are not provided on the shoe of the prior art." Following these arguments, the examiner allowed the new claims, which issued as independent claims 1, 2, and 3 of the '792 patent. The inventor then assigned the '792 patent to HHI.
 
 
 15
 In 1995, HHI sued Avia for infringement of the '792 patent. Later that year, Avia sought a reexamination of the patent before the PTO, and the district court stayed the suit pending the outcome of the reexamination proceedings.[2] The litigation resumed after the patent emerged from the reexamination proceedings with only a slight change to claims 1 and 3.[3] On January 8, 1999, the district court conducted a claim construction hearing and issued a written order two months later.
 
 
 16
 In its order, the district court analyzed the '792 patent and its prosecution history, and construed the term "central longitudinal groove"--the only term at issue on appeal--as being "a relatively long and narrow structure that extends longitudinally or lengthwise completely through the center so as to divide the heel part into a pair of 'fins.' The width of the central longitudinal groove must be less than the combined width of the two fins." Based on this claim construction, HHI and Avia agreed to a "Stipulation and Order of Dismissal" in which HHI stipulated to non-infringement under the district court's claim construction and agreed to dismiss its remaining claims with prejudice, and Avia agreed to dismiss its counterclaims without prejudice. Pursuant to that agreement, the district court entered a final order of non-infringement and dismissed all the remaining claims and counterclaims. This appeal followed.
 
 DISCUSSION
 
 17
 The only issue on appeal is whether the district court correctly construed the term "central longitudinal groove" to require that the width of the groove must be less than the combined width of the fins. Claim construction is a question of law, seeMarkman v. Westview Instruments, Inc., 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996), that we review de novo on appeal, see Cybor Corp. v. FAS Techs., Inc., 128 F.3d 1448, 1456, 46 USPQ 1169, 1174 (Fed Cir. 1998) (en banc). Proper claim construction entails an analysis of a patent record's intrinsic evidence--the claim language, the written description, and the prosecution history. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582-83, 39 USPQ2d 1573, 1576-77 (Fed. Cir. 1996). If the meaning of a claim is unambiguous from the intrinsic evidence, then a court may not rely on extrinsic evidence for purposes of claim construction. See Key Pharms. v. Hercon Labs. Corp., 161 F.3d 709, 716, 48 USPQ2d 1911, 1917 (Fed. Cir. 1998) (explaining that a court may receive extrinsic evidence to educate itself about the underlying technology, but it cannot use extrinsic evidence "to arrive at a claim construction that is clearly at odds with the claim construction mandated by the [intrinsic evidence]").
 
 
 18
 Claim construction analysis begins with the claim language itself. See Karlin Tech. Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971, 50 USPQ2d 1465, 1467 (Fed. Cir. 1999); Reinshaw PLC v. Marposs Societa per Azioni, 158 F.3d 1243, 1248, 48 USPQ2d 1117, 1120 (Fed. Cir. 1998). As a starting point, the court gives claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art. See Hoechst Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1578, 38 USPQ2d 1126, 1129 (Fed. Cir. 1996) (stating that the court assigns a claim term the meaning "that it would be given by persons experienced in the field of invention"); Markman, 52 F.3d at 980, 34 USPQ2d at 1330. Here, the relevant claim language recites a "central longitudinal groove in the underside of the heel part extending forwardly through the heel part into the underside of the sole part to divide the lower surface of the heel part into a pair of fins." Col. 5, ll. 45-58. Thus, our analysis focuses on the word "groove" in the term "central longitudinal groove." The ordinary and accustomed meaning of "groove," as the district court correctly found, is a "relatively long and narrow structure."
 
 
 19
 The claim term's ordinary and accustomed meaning initially serves as a default meaning because the patentee may act as a lexicographer and ascribe a different, or modified, meaning to the term. See Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477, 45 USPQ2d 1429, 1432 (Fed. Cir. 1998) (observing that an inventor, acting as a lexicographer, may bestow "a special meaning to a term in order to convey a character or property or nuance relevant to the particular invention"); Intellicall, Inc. v. Phonometrics, Inc., 952 F.2d 1384, 1388, 21 USPQ2d 1671, 1674 (Fed. Cir. 1994). The court, therefore, must examine a patent's specification and prosecution history to determine whether the patentee has given the term an unconventional meaning. SeeVitronics, 90 F.3d at 1582, 39 USPQ2d at 1577 (holding that "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning [because the specification] acts as a dictionary when it expressly defines terms . . . or when it defines terms by implication" (emphasis added)); Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576, 34 USPQ2d 1673, 1676 (Fed. Cir. 1995) (determining that "[a]rguments and amendments made during the prosecution of a patent application . . . as well as the specification and other claims must be examined to determine the meaning of terms in a claim" (emphasis added)). If the patentee has not done so, the term's ordinary and accustomed meaning controls. See York Prods., Inc. v. Central Tractor Farm & Family Ctr., 99 F.3d 1568, 1572, 40 USPQ2d 1619, 1622 (Fed. Cir. 1996) ("Without an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning.").
 
 
 20
 The written description of the '792 patent supports the district court's initial interpretation of groove as a long and narrow structure. The written description teaches an inverted groove that divides a heel lengthwise and forms fins on each side. It thus follows that the width of the fins is inversely proportional to the width of the groove. The written description also explains that the claimed invention improves shock absorption stability because "a large part of the total heel area is deployed in shock absorption, [resulting] in a very good cushioning effect." Col. 4, ll. 36-38 Thus, a narrow groove complemented by a wide pair of fins is consonant with the purpose of the invention. Cf.Reinshaw, 158 F.3d at 1250, 48 USPQ2d at 1122 (reasoning that a claim interpretation that aligns with the purpose of the invention is likely to be correct).
 
 
 21
 Review of the prosecution history, however, reveals that the inventor disclaimed a particular interpretation of groove, thereby modifying the term's ordinary meaning. See CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1158, 42 USPQ2d 1577, 1585 (Fed. Cir. 1997) (observing that statements made during prosecution commit the inventor to a particular meaning of a claim term that is binding during litigation);Southwall Techs., 54 F.3d at 1576, 34 USPQ2d at 1676 ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."). During prosecution of the '792 patent, the inventor submitted drawings comparing the features of the claimed invention to a hypothetical combination of the prior art Lombard and Bowerman patents. The inventor then distinguished the prior art by arguing that the claimed invention "provid[es] a much narrower groove for a totally different purpose, namely . . . to involve as much of the underneath surface of the footwear as possible in a cushioning and supporting function." Flowing from this statement is the inventor's clear disavowal of footwear having a groove width greater than that disclosed in the prior art. The Lombard patent, in turn, teaches a shoe with a groove width greater than the combined width of the two fins. Thus, the district court correctly held that the inventor necessarily defined the central longitudinal groove as requiring a width that must be less than the combined width of the two fins.
 
 
 22
 On appeal, HHI asserts that the district court incorrectly analyzed the prosecution history. HHI contends that a reasonable competitor would understand that the inventor's "much narrower groove" statement was an erroneous statement rather than a disavowal of a particular width relationship because the statement was made in reference to drawings submitted during prosecution, and the specification contains figures depicting a groove that is wider than the fins.
 
 
 23
 HHI's argument is unavailing. The '792 patent is devoid of any indication that the proportions of the groove and fins are drawn to scale. HHI's argument thus hinges on an inference drawn from certain figures about the quantitative relationship between the respective widths of the groove and fins. Under our precedent, however, it is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue. See In re Wright, 569 F.2d 1124, 1127, 193 USPQ 332, 335 (CCPA 1977) ("Absent any written description in the specification of quantitative values, arguments based on measurement of a drawing are of little value."); In re Olson, 212 F.2d 590, 592, 101 USPQ 401, 402 (CCPA 1954); cf. Manual of Patent Examining Procedure § 2125 (1998). Thus, in the present case, a reasonable competitor, being aware that figures in a patent are not drawn to scale unless otherwise indicated, would understand the arguments in the prosecution history as clearly disclaiming a groove having a width greater than the combined width of the fins.
 
 
 24
 HHI's argument therefore reduces to a request for a mulligan that would erase from the prosecution history the inventor's disavowal of a particular aspect of a claim term's meaning. Such an argument is inimical to the public notice function provided by the prosecution history. The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention. See Vitronics, 90 F.3d at 1583, 39 USPQ2d at 1577; Lemelson v. General Mills, Inc., 968 F.2d 1202, 1208, 23 USPQ2d 1284, 1289 (Fed. Cir. 1992). In the present case, the inventor's statements about groove width are part of the prosecution history and form the totality of the public record upon which competitors rely. See Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 979, 52 USPQ2d 1109, 1113 (Fed. Cir. 1999) (stating that the totality of the prosecution history must be considered and reasoning that it is "irrelevant whether [the inventor] relinquished [a] potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference"). Were we to accept HHI's position, we would undercut the public's reliance on a statement that was in the public record and upon which reasonable competitors formed their business strategies.
 
 
 25
 HHI further cites Intervet Am. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 12 USPQ2d 1474 (Fed. Cir. 1989), for the proposition that erroneous statements made during prosecution do not affect claim construction analysis. Intervet is inapposite to this case and does not support HHI's cause. In Intervet, the patentee, responding to an office action, amended three claims to include the term "single administration." Id. at 1053-54, 12 USPQ2d at 1476-77. Then, in the remarks accompanying the amendment, the patentee made an unqualified statement that the "claims are restricted to a single vaccination." See id. at 1054, 12 USPQ2d at 1477. On appeal, the issue was whether claims without the term "single administration" nonetheless included that limitation because of the patentee's remarks. See id. This court held that the remarks were clearly erroneous and did not apply to all the claims, but were limited to only those claims that included the term "single administration." See id. Thus, although not invoking the exact terminology, we implicitly reasoned that a reasonable competitor would perceive the remarks as erroneous and understand them as applying only to the amended claims. The court also concluded that, to the extent the examiner may have relied on those remarks in allowing all the claims to issue, such confusion was likely cured by subsequent communications between the examiner and the patentee. See id.
 
 
 26
 The present circumstances are distinct from Intervet. Here, unlike Intervet, no conspicuous error exists. The term "central longitudinal groove" is present in all three claims of the '792 patent. Thus the inventor's statements and submitted drawings concerning groove width apply with uniform force to all the claims. See Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1348, 47 USPQ2d 1418, 1427 (Fed. Cir. 1998) ("Absent qualifying language in the remarks, arguments made to obtain the allowance of one claim are relevant to interpreting other claims in the same patent.") Accordingly, a reasonable competitor reading the '792 patent's prosecution history would have no reason to believe that a mistake was made or that the inventor meant anything other than what he said. Also, unlike Intervet, the '792 patent issued immediately after the inventor's arguments regarding the prior art; consequently, the examiner continued to understand that the groove in the '792 patent was narrower than the one in the Lombard patent.
 
 CONCLUSION
 
 27
 Because we hold that during the prosecution of the '792 patent, the inventor disclaimed a groove width greater than the combined width of the fins, we affirm the district court's claim construction.
 
 
 28
 AFFIRMED.
 
 COSTS
 
 29
 Each party shall bear its own costs.
 
 
 
 NOTES:
 
 
 [1]
 Both parties agree that the terms "channel" and "rims" in the Lombard patent are the same as the terms "groove" and "fins" in the '792 patent.
 
 
 [2]
 During the pendancy of the reexamination proceedings, Avia sold assets, including its inventory of allegedly infringing shoes, to American Sporting Goods Corporation ("ASG"). In 1997, following the conclusion of the reexamination proceedings, HHI filed a complaint against ASG for infringement of the '792 patent. Then, in 1998, HHI also sued Reebok International Ltd. ("Reebok"), which was the sole shareholder of Avia at the time the suit was pending. All three suits were subsequently consolidated for purposes of discovery. HHI resolved its claim against ASG through stipulated dismissal, and the district court dismissed HHI's claim against Reebok on summary judgment, which is not on appeal.
 
 
 [3]
 During the reexamination proceeding, claims 1 and 3 of the '792 application were amended by replacing the word "forwardly" with "completely."