This Opinion is a
Precedent of the TTAB

Mailed: October 18, 2017

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

*Poly-America, L.P.*
*v.*
*Illinois Tool Works Inc.*

_____

Cancellation No. 92056833

_____

Jerry R. Selinger of Patterson & Sheridan LLP for Poly-America, L.P.

Mark J. Liss, Kevin C. Parks and Michelle L. Zimmermann of Leydig Voit & Mayer, Ltd. for Illinois Tool Works Inc.

_____

Before Richey, Deputy Chief Administrative Trademark Judge, Cataldo and Shaw, Administrative Trademark Judges.

Opinion by Cataldo, Administrative Trademark Judge:

Poly-America, L.P., ("Petitioner") seeks cancellation of three registrations issued on the Principal Register and currently owned by Illinois Tool Works Inc. ("Respondent").

Registration No. 0946120 is for the mark ("colored line mark") displayed below:



for "plastic bags" in International Class 16. The registration includes the following

description of the mark:

> The mark consists of a horizontal stripe adjacent the bag top lined for the color red, however, no claim is made to any specific color apart from the mark as shown.[1]

Registration No. 1055114 is for the mark ("zipper flange mark") displayed below:



for "flexible plastic recloseable fastener strips" in International Class 20. The

registration includes the following color lining statement:

> The drawing is lined for the color red, however, no claim is made to color.[2]

Registration No. 1294243 is for the mark ("rollstock mark") displayed below:

---

[1] Issued on October 21, 1972; third renewal.
[2] Issued on December 28, 1976; third renewal.



for "reclosable film tubing and plastic film sheeting, not for wrapping" in International Class 17. The registration includes the following description of the mark and color lining statement:

> The mark consists of a continuous colored stripe extending for the length of plastic film tubing and plastic film sheeting having a continuous reclosable strip on the surface.

> The drawing is lined for the color red, however, no claim is made to a specific color.[3]

Petitioner seeks cancellation of all three of Respondent's registrations under Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5), on the ground that each of the product designs comprises matter that, as a whole, is functional. Petitioner further seeks cancellation of the colored line mark registration under Section 14(3) of the Trademark Act, 15 U.S.C. § 1064(3), on the ground of abandonment as a result of Respondent's actions causing the mark to become a generic indicator for the identified goods.

In its answer, Respondent denied the salient allegations of the petition to cancel.[4]

---

[3] Issued on September 11, 1984; second renewal.

[4] Respondent also asserted certain matters as affirmative defenses but did not pursue them by motion or at trial. Accordingly, they are deemed waived. *See Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.*, 107 USPQ2d 1750, 1753 (TTAB 2013), *aff'd mem.*, 565 F.

I. Evidentiary Matters

Each party has filed a number of objections against certain testimony and evidence introduced by its adversary. We have considered each objection. Some concern the weight due the evidence rather than its admissibility, and none is to evidence material to our outcome-determinative findings of fact.

Ultimately, the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence in this case, including any inherent limitations, which precludes the need to strike the challenged testimony and evidence if the objection is well-taken. Given the circumstances, we choose not to make specific rulings on each and every objection. We have accorded the testimony and evidence whatever probative value it merits, keeping the parties' objections in mind, and comment as needed on its probative value elsewhere in the opinion. *See Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d at 1755, *aff'd mem.*, 565 Fed. Appx. 900 (Fed. Cir. 2014); *Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1104 (TTAB 2007). *See also Krause v. Krause Publ'ns Inc.*, 76 USPQ2d 1904, 1907 (TTAB 2005) ("Where we have relied on testimony to which respondent objected, it should be apparent to the parties that we have deemed the material both admissible and probative to the extent indicated in the opinion.").

---

Appx. 900 (Fed. Cir. 2014); *Harry Winston, Inc. v. Bruce Winston Gem Corp.,* 111 USPQ2d 1419, 1422 (TTAB 2014).

II. The Record

The record automatically includes the pleadings (but not the exhibits thereto),[5] and the application files for the challenged registrations. Trademark Rule 2.122(b), 37 C.F.R § 2.122(b). *Cold War Museum, Inc. v. Cold War Air Museum, Inc.,* 586 F.3d 1352 92 USPQ2d 1626, 1628 (Fed. Cir. 2012).

Petitioner submitted the following testimonial depositions:

Testimony of Michael Ross, President and CEO of Petitioner, with exhibits;

Testimony of Anthony Bertrand, Vice President of Purchasing of Petitioner, with exhibits;

Testimony of Trent Mallory, Vice President of Sales of Petitioner;

Testimony of Robert Klein, Chairman of Applied Marketing Science, Inc., expert for Petitioner, with an exhibit.

Petitioner also submitted, by notice of reliance:

First Notice of Reliance upon certain patents and certain of Respondent's Admissions;

Second Notice of Reliance upon certain patents;

Third Notice of Reliance upon certain excerpts from the discovery deposition of one of Respondent's Fed. R. Civ. P. 30(b)(6) witnesses, Eric Plourde, Manager, Intellectual Property, Zip-Pak division of Respondent with exhibits;

---

[5] The exhibits to the petition for cancellation (1 TTABVUE 30-379) consisting of copies of patents, photographs of certain goods identified in the involved registrations, packaging for certain of the identified goods and Internet materials, are not evidence in this proceeding and have not been considered. Except in limited circumstances, which are not present here, an exhibit to a pleading is not evidence on behalf of the party to whose pleading the exhibit is attached unless identified and introduced in evidence as an exhibit during the period for the taking of testimony. Trademark Rules 2.122(c) and 2.122(d)(1); 37 C.F.R. § 2.122(c) and 37 C.F.R. § 2.122(d)(1).

Fourth Notice of Reliance upon excerpts from the discovery depositions of Steven Ausnit, patent consultant for Respondent and former President and CEO of Minigrip; James Kohl, consultant for Respondent and former General Manager and President of Minigrip; and John Stevens, employee and consultant for Respondent and former Operations Manager of Minigrip, which the parties have stipulated may be accepted as testimony;

Fifth Notice of Reliance upon certain court documents from prior proceedings in which Respondent was involved relating to the involved marks, the prosecution history of the zipper flange mark registration, certain excerpts from news articles and trade publications, prosecution history from third-party Reg. No. 2818766, not at issue in this proceeding, and excerpts from the prosecution history of third-party Reg. No. 1592945, not at issue in this proceeding;

Sixth Notice of Reliance upon responses to certain of Petitioner's interrogatories and admission requests provided by Respondent in this case;

Seventh Notice of Reliance in rebuttal upon excerpts from the discovery deposition transcripts of Michael Ross and Anthony Bertrand.

Respondent submitted the following testimonial depositions:

Testimony of Eric Plourde, Manager, Intellectual Property, Zip-Pak division of Respondent with exhibits;

Testimony of Alejandra Keck, Paralegal, Leydig, Voit & Mayer, Ltd., with exhibits;

Testimony of Jeffrey M. Samuels, Rebuttal Expert for Respondent with exhibits.

Respondent also submitted the following evidence:

Notice of Reliance upon excerpts from the discovery depositions of Anthony Bertrand, Michael Ross and Eric Plourde;

Notice of Reliance upon excerpts from the discovery depositions of Steven Ausnit, John Stevens and James Kohl, which the parties have

stipulated may be accepted and used as testimony in this proceeding;

Notice of Reliance on Official Records; and

Notice of Reliance on Internet webpages.

Petitioner and Respondent filed briefs.[6]

III. Standing

Standing is a threshold issue that must be proved by a plaintiff in every *inter partes* case. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 1401 (2015); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). Section 14 of the Trademark Act establishes a broad class of persons who are proper petitioners; by its terms, the statute only requires that a plaintiff have a belief that it would suffer damage if the mark is registered. *See* 15 U.S.C. § 1064. The plaintiff must demonstrate that it has a "real interest," i.e., a direct and personal stake, in the outcome of the proceeding and a reasonable basis for its belief of damage. *Ritchie v. Simpson*, 50 USPQ2d at 1025-26.

In considering whether Petitioner has properly pleaded and proven its standing to bring claims of functionality and abandonment, we note that, to establish its standing to assert a mere descriptiveness or genericness ground of opposition or

---

[6] We will discuss those portions of the parties' evidence and briefs that are properly designated "confidential" only in general terms as necessary to support our determination. Moreover, pursuant to Trademark Rule 2.116(g), 37 C.F.R. § 2.166(g), "[t]he Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party."

cancellation, "a plaintiff need only show that it is engaged in the manufacture or sale of the same or related goods as those listed in the defendant's involved application or registration and that the product in question is one which could be produced in the normal expansion of plaintiff's business; that is, that plaintiff has a real interest in the proceeding because it is one who has a present or prospective right to use the term descriptively in its business." *Binney & Smith Inc. v. Magic Marker Indus., Inc.*, 222 USPQ 1003, 1010 (TTAB 1984). A petitioner is required only to be in a position to have a right to use the mark in question. *See Ritchie v. Simpson*, 50 USPQ2d at 1028; *Southwire Co. v. Kaiser Aluminum & Chem. Corp.*, 196 USPQ 566 (TTAB 1977). *See also* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 20:50 (4th ed. June 2017 Update). This test logically also applies to the question of whether Petitioner has standing to assert its claim that Respondent's mark has been abandoned due to its loss of significance as a mark or comprises matter that, as a whole, is functional. *See Nobelle.com LLC v. Qwest Comm'cns Int'l Inc.*, 66 USPQ2d 1300 (TTAB 2003); *Doyle v. Al Johnson's Swedish Rest. & Butik Inc.* 101 USPQ2d 1780 (TTAB 2012). Moreover, if Petitioner can show standing on the ground of functionality, it has the right to assert any other grounds, including abandonment. *See Corporacion Habanos SA v. Rodriguez*, 99 USPQ2d 1873, 1877 (TTAB 2011). For a functionality claim, standing is also established, *inter alia*, if plaintiff shows that it is a competitor. *AS Holdings, Inc. v. H & C Milcor, Inc., f/k/a Aquatico of Texas, Inc.*, 107 USPQ2d 1829 (TTAB 2013). "A belief in likely damage can be shown by

establishing a direct commercial interest." *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

The evidence of record establishes that Petitioner is a manufacturer and supplier of plastic film and garbage bag products under its own name brands as well as private label, or store, brands.[7] Each of Petitioner's three major competitors in the trash bag business is licensed to use Respondent's involved marks, and each also produces food storage bags that feature a colored closure of the type represented by the mark in the colored line mark registration No. 0946120.[8] Petitioner has engaged in discussions with numerous current and prospective customers regarding its proposed entry into the food storage bag business and "has every expectation that it will be able to sell reclosable food storage bags if it enters the market."[9] Petitioner has planned to add reclosable plastic consumer storage bags to its product line since 2010.[10] Petitioner has purchased manufacturing equipment, created product specifications, produced internal test products and met with representatives from a number of retail businesses in preparation for its entry into the reclosable consumer storage bag business.[11] Petitioner believes that expanding its product line to include reclosable

---

[7] 85 TTABVUE 11-13; 90 TTABVUE 9-10.

[8] 85 TTABVUE 16-19.

Respondent's licensees include S.C. Johnson (ZIPLOC brand bags); Clorox Co. (GLAD brand bags); Presto/Reynolds; AEP/Webster; and Trinity Packaging. 91 TTABVUE 17.

[9] 92 TTABVUE 22; 85 at 20-23; 90 TTABVUE 7.

[10] 48 TTABVUE 3.

[11] *Id*. at 4.

consumer storage bags is a natural expansion of its existing business.[12] Petitioner estimates that it can commence sales of reclosable consumer storage bags within two to three months after conclusion of this proceeding.[13]

The products identified in the zipper flange mark registration and the rollstock mark registration are used in the manufacture of reclosable food storage bags purchased by end-user consumers.[14] Petitioner seeks to manufacture or purchase these goods in order to compete in the market for reclosable food storage bags purchased by end-user consumers.[15] It is Petitioner's understanding that Respondent "has, in the past, asserted that completed bags with colored zipper closures infringe **all** of the subject marks."[16] (emphasis in original.)

Petitioner's customers have requested Petitioner to supply reclosable food storage bags with colored closures in addition to garbage bags to achieve brand equivalence with national brand reclosable bags such as those offered by Petitioner's competitors and Respondent's licensees.[17] Petitioner believes that its competitors' ability to offer reclosable food storage bags in addition to trash bags to their retail customers grants these competitors an advantage in marketing trash bags to such retail customers as a result of bundling the two products together.[18] Petitioner asserts that it "clearly has

---

[12] *Id.*

[13] *Id.* at 5.

[14] 85 TTABVUE 33-45, 52; 87 TTABVUE 31-5.

[15] *Id.*

[16] *Id.*

[17] 85 TTABVUE 22, 55-8, 84-93; 90 TTABVUE 17, 22.

[18] *Id.* at 19; *Id.* at 16-7.

an interest in operating its business without being unfairly encumbered by the inability to use the functional features that fall within the scope of the [Respondent's] marks that are the subject of this proceeding."[19]

Respondent argues that

> [W]ith respect to Reg. Nos. 1055114 [zipper flange mark] and 1294243 [rollstock mark], Poly-America has acknowledged that it is not now in, nor does it intend to enter, the markets to sell either flexible plastic recloseable fastener strips or recloseable film tubing and plastic film sheeting. … As such, it cannot be disputed that with respect to these two registrations, Poly-America is a mere interloper, not engaged in the market[ing] or sale of the same or related goods, and has no real interest in challenging the validity of Reg. Nos. 1055114 and 1294243.[20]

However, the evidence discussed above establishes that while Petitioner may not intend to sell flexible plastic reclosable fastener strips or film tubing and sheeting, it seeks to manufacture or purchase these goods for purposes of manufacturing reclosable food storage bags. Moreover, Petitioner has submitted evidence that it risks an infringement lawsuit that would include all three involved registrations unless they are cancelled. Thus, Petitioner has established a direct commercial interest in the goods identified under the marks and an expectation of harm resulting from its inability to enter the reclosable food storage bag market due to Respondent's enforcement of its involved registrations.

Petitioner's present interest in using colored closures on food storage bags and their components which comprise the marks in the involved registrations, sufficiently

---

[19] 92 TTABVUE 45.

[20] 93 TTABVUE 31.

Respondent does not challenge Petitioner's standing with regard to the colored line mark registration.

supports standing. Further, we find the record to contain sufficient proof of the allegations related to standing.

IV. Functionality

Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5), provides that registration of a product design may be denied if it "comprises any matter that, as a whole, is functional." Generally, a product design or product feature is considered to be functional in a utilitarian sense if it is (1) "essential to the use or purpose of the article," or if it (2) "affects the cost or quality of the article." *TrafFix Devices Inc. v. Mktg. Displays Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1006 (2001) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982)). Section 14(3) of the Trademark Act, 15 U.S.C. § 1064(3), allows a petition to cancel a registration on the ground of functionality, at any time during the life of the registration.

In making our determination of functionality under *Inwood* we are guided by the analysis first applied in *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982). *See also Valu Eng'g Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1427 (Fed. Cir. 2002). *Morton-Norwich* identifies several categories of evidence that, if present in a case, may be helpful in determining whether a particular design is functional: (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a

comparatively simple or cheap method of manufacturing the product. *Morton-Norwich*, 213 USPQ at 15-16.

The Supreme Court has made it clear that if functionality is properly established under *Inwood*—such as where a patent's disclosures show that the design is one of a number of superior ways to perform a function—further inquiry into other categories of evidence listed in *Morton-Norwich* such as the availability of alternatives and cost information—is not necessary. *TrafFix Devices*, 58 USPQ2d at 1006 ("Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature."). However, the Supreme Court's decision in *TrafFix* did not alter the Federal Circuit's prior approach to analysis of functionality. *See Valu Eng'g Inc. v. Rexnord Corp.,* 61 USPQ2d at 1427 ("We do not understand the Supreme Court's decision in *TrafFix* to have altered the *Morton-Norwich* analysis"). Nor did it affect the functionality analysis employed in the Federal Circuit's later decision in *In re Bose Corp.*, 476 F.3d 1331, 81 USPQ2d 1748, 1752 (Fed. Cir. 2007). We find *Morton-Norwich* to be a useful guide in examining evidence of functionality in this case, as well, particularly its consideration of patents, which is critical here. It is not required that evidence in all four *Morton-Norwich* categories be proven in every case, nor do all four categories have to weigh in favor of functionality to support a refusal. *In re Change Wind Corp.*, 123 USPQ2d 1453, 1456 (TTAB 2017); *In re Heatcon, Inc.*, 116 USPQ2d 1366, 1370 (TTAB 2015).

Petitioner, as the plaintiff in this inter partes proceeding, bears the initial burden of presenting evidence sufficient to make out a *prima facie* case of functionality. If a

challenger "has made a *prima facie* showing of functionality, the burden shifts to the applicant to prove nonfunctionality." *Valu Eng'g*, 61 USPQ2d at 1429 (citation omitted); *In re Howard Leight Indus. LLC*, 80 USPQ2d 1507, 1509 n.7 (TTAB 2006). Functionality is a question of fact whose determination depends on the totality of the relevant evidence. *Valu Eng'g*, 61 USPQ2d at 1424. We now consider the first *Morton-Norwich* category of evidence and whether it establishes functionality under *Inwood*.

The Existence of Patents.

The first *Morton-Norwich* category assesses whether a utility patent discloses the utilitarian advantages of the design. A utility patent is strong evidence that the claimed features for which an applicant or registrant seeks trademark protection are essential to the use or purpose of the article (or affect the cost or quality of the item), and is therefore sufficient evidence of functionality. *TrafFix Devices*, 58 USPQ2d at 1005. A utility patent need not "claim the exact configuration for which trademark protection is sought in order to undermine an applicant's assertion that an applied-for mark is not de jure functional." *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1377 (Fed. Cir. 2012); *Change Wind Corp.*, 123 USPQ2d at 1456. *In re Loggerhead Tools, LLC,* 119 USPQ2d 1429, 1432 (TTAB 2016) ("We find Applicant's description of the invention in the utility patent, taken together with the drawings therein, to be on point with the relevant portion of the description and drawing of the tool in the present application for this product configuration motion mark."). Moreover, Professor McCarthy has noted that it may be untenable for a person who

obtained a utility patent for an invention to later claim trademark significance in the same invention:

> [A functional patent] is particularly entitled to great weight if the patent was applied for by the same person who now asserts trademark significance in the same configuration. A kind of estoppel arises. That is, one cannot argue that a shape is functionally advantageous in order to obtain a utility patent and later assert that the same shape is non-functional in order to obtain trademark protection. Functional patent protection and trademark protection are mutually exclusive.

1 *McCarthy, supra,* § 7:89.30.

In the case at hand, Petitioner has introduced into the record expired U.S. Patent No. 3054434 ('434 patent), issued to Respondent's predecessor.[21] We have reviewed the utility patent as a whole as evidence of functionality under *TrafFix. See also In re Howard Leight Indus. LLC*, 80 USPQ2d at 1511.

The '434 patent[22] is for an "article such as a pouch or similar container having a new and improved resilient type fastener structure particularly adapted to minimize accidental separation of the engaged portion of the fastener structure when subject to load forces." ('434 patent, column 1, lines 8-13).[23]

> A primary object of this invention is to provide an improved resilient type fastener structure for a pouch. ('434 patent, column 1, lines 14-15).

---

[21] Steven Ausnit is the first named co-inventor in the '434 patent, which was owned by Flexigrip and later Minigrip. Mr. Ausnit was a founder of Flexigrip. Flexigrip formed Minigrip, and later merged Flexigrip with and into Minigrip. Minigrip subsequently was purchased by a company named Signode. Signode and the Dow Chemical Co. formed Zip-Pak. Afterward, Respondent acquired Signode and later Zip-Pak. 66 TTABUVE 17-33.

[22] Issued September 18, 1962. 62 TTABVUE 24-28.

[23] *Id* at 25.

A further object of the present invention is to provide a resilient type fastener structure which is capable of being opened by means of a stamped low cost type of slider. ('434 patent, column 1, lines 20-23).[24]

The stated object of the patent is to provide a resilient fastener for a bag or pouch specifically intended to reduce the risk of accidental separation of the fastener when the bag or pouch is filled. The patent includes the following disclosures:

> According to the general features of the present invention, the bag or pouch is provided with an improved resilient type fastener. The pouch includes a pouch front wall and a pouch rear wall and front and rear fastener strips are carried thereon respectively. The rear fastener strip is provided with a spacer flap attached at the top of a web portion from which depends a thickened rear marginal flap portion in confronting relationship to a front marginal flap portion. Mating ribs and grooves are provided on the confronting marginal flap portions extending lengthwise of the pouch and enabling the marginal flap portions to be squeezed together to close the pouch. A slider may be used for this purpose. ('434 patent, column 1, lines 29-41).[25]

The patent discloses that the resilient fastener strips consist of mating ribs and grooves located on flaps, with an optional slider, that are squeezed together to close the bag or pouch. The patent further discloses that the bag or pouch closure may be attained without use of a slider.

> The confronting faces of the marginal portions 18 and 21 have a plurality of longitudinally extending grooves 23 and ribs or ridges 24 formed integrally therewith such that the grooves 23 on the marginal flap portion 18 and the ribs 24 on the marginal flap portion 21 are in aligned relationship so as to be adapted for locking engagement with one another. ('434 patent, column 3, lines 19-25).[26]

---

[24] *Id.*

[25] *Id.*

[26] *Id.* at 26.

> This locking engagement is attained by forming the flap portions 18 and 21 including the ribs and grooves 23 and 24 of substantially similar cross-sectional shape. ('434 patent, column 3, lines 26-28).[27]

> In FIGURE 5 is shown a modified type of pouch 7'. In this case, the pouch 7' is identical to the pouch 7 except that this is a sliderless type of pouch. The pouch 7' includes a pair of strips 9', 9' which are identical to the strips 9, 9 as shown in the first form of the invention except that no shoulders are required to assist in holding the slider onto the strips as was the case in the illustrated form shown in FIGURES 1-4. … *In order to facilitate identification of the flanges as means to assist in the separation of the strips 9', 9' when they are engaged together, the flanges may be colored differently than the strips themselves.* Excellent results may be obtained where the strips 9', 9' are of a clear color while one or both of the flanges 40, 41 are of a red color. ('434 patent, column 4, lines 52-70, emphasis added).[28]

FIGURE 5, on the drawing page of the '434 patent, reproduced below, depicts a sliderless closure for a bag or pouch consisting of flanges (40 & 41) that may be colored differently from the strips (9') enabling their identification to facilitate separation. Thus, as described above and as shown in FIGURE 5, below, the patent particularly discloses that coloring one or both of the flanges red while the strips are clear colored may achieve excellent results.

---

[27] *Id.*

[28] *Id.*



The involved marks are specified in the sixth claim of the invention:

6. A flexible closure comprising a pair of flexible closure strips each having a web portion and a marginal portion integral therewith, the

---

[29] *Id.* at 24.

marginal portions having interlocking rib and groove elements extending therealong and forming a lock between the marginal portions when engaged, one of the marginal portions being alongside its associated web portion and joined thereto by a portion extending laterally between said one marginal portion and its associated web portion and being integral therewith formed of one piece with said one marginal portion and associated web portion, said lateral portion being above the longitudinal centerline of the marginal portions when engaged, and a separating flange on the marginal portion of at least one of said strips for separating the strips and the rib and groove elements and disengaging the lock, *said flange being colored differently than the strips to facilitate identification of the flange and assist in separation of the strips.* ('434 patent, column 6, lines 29-46, emphasis added).[30]

The patent claims as a feature of the invention a flexible closure consisting of flexible strips with interlocking ribs and grooves that join together to form a lock when engaged. The strips include a flange (40 & 41) to allow separation of the rib and groove elements of the strips (9′) to disengage the lock. The flange is colored differently than the strips to assist in identifying the flange and separating the strips. We find that the language of the sixth claim of the '434 patent defines the same features of the registered trademarks as described by Respondent, namely, the colored stripe on the recloseable fastener strips shown in each of the three registrations.

The side-by-side illustration shown below is also instructive. The marks in the involved registrations are displayed directly above Figure 1 of the '434 patent. It is obvious that Figure 1 of the patent drawing showing the bag (7) and fastener structure (8) is remarkably similar to Respondent's three registrations, albeit with the slider (25) type of pouch rather than the sliderless type described in claim 6:

---

[30] *Id.* at 27.



(colored line mark, zipper flange mark, and rollstock mark registrations)



(The '434 patent drawing, Fig. 1)

*See In re Lincoln Diagnostics Inc.*, 30 USPQ2d 1817, 1823 (TTAB 1994) (applicant's design is not identical to the design of the preferred embodiment depicted in the patent, but the two are substantially similar in appearance and function); *see also TrafFix*, 58 USPQ2d at 1005 (that the distance separating the dual springs disclosed in the plaintiff's patent was wider than in product at issue made "little difference" because it was the dual-spring feature generally that made the product work as it did).

Respondent argues that no utilitarian advantages are described by the patent with respect to the applied-for marks, and contends that:

> [w]hile Steven Ausnit initially believed that the Color Line Trademark had functional aspects, more than 50 years of experience in the plastic bag industry and numerous years in the consumer storage retail market has taught him that his initial belief was incorrect; there never has been any functionality to the Color Line Trademark and consumers do not see the Color Line Trademark as a functional feature.[31]

However, the prosecution history of the '434 patent contradicts Respondent's argument. In response to an initial and subsequent rejection of the color line feature by the Patent Examiner assigned to the application underlying the '434 patent, Respondent's predecessor argued that the claim ultimately amended to claim 6,

> requires flange members with one of the flange members being colored. The Examiner contends that this is a matter of design or skill, but it is not shown by the prior art, affords an advantage, and cannot be regarded as obvious without a basis in the prior art.[32]

"The prosecution history constitutes a public record of the patentee's representations concerning the scope and the meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct . . . ." *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957, 55 USPQ2d 1487, 1491 (Fed. Cir. 2000). Further, there is no evidence that Respondent sought to disclaim claim 6 of the '434 patent based upon Mr. Ausnit's asserted realization that those features of the invention recited in the sixth claim conferred no functional benefit. *See* 35 U.S.C. § 253 ("A patentee, whether of the whole or any sectional interest therein, may . . . make disclaimer of any complete claim, stating therein the extent of his interest in such patent."). To the contrary, Respondent's predecessors

---

[31] 94 TTABVUE 15-6.

[32] 66 TTABVUE 85.

stated in advertising brochures that the "color flange immediately identifies the point of opening"[33] and "also serves a practical purpose. It immediately identifies the point of opening."[34] Respondent's predecessors listed the '434 patent, among others, in its advertising brochures and utilized one of the same brochures in the application underlying the colored line mark registration.[35] Thus, Mr. Ausnit's current testimony that the color line served no function is belied by the actions and statements of Respondent's predecessors, one of which (Flexigrip) he co-founded and for another of which (Minigrip) he served as President and CEO.[36] Nor does Mr. Ausnit's testimony regarding the asserted difficulties experienced by consumers in opening reclosable plastic bags featuring the colored flange when they were first introduced[37] change the fact that the color line feature was intended to serve and did serve to "immediately identify the point of [the bags'] opening."[38] Simply put, its predecessors having availed themselves of the protection of the '434 patent until its expiration, Respondent's convenient change of heart  falls far short of convincing us that the features described in the sixth claim were never functional and may now be the subject of trademark protection.

---

[33] *Id.* at 110.

[34] *Id.* at 104.

[35] 68 TTABVUE 94-99.

[36] According to Mr. Ausnit's testimony and supporting documents, the advertising brochures in question were published by Flexigrip, a predecessor in interest to Respondent. 66 TTABVUE 100. Flexigrip merged into Minigrip. *Id.* at 26. Mr. Ausnit was the President and CEO of Minigrip. *Id.* at 24.

[37] 74 TTABVUE 173-4.

[38] 66 TTABVUE 104.

Respondent further argues that

> while [Respondent] contends that its Color Line Trademark never was functional, even to the extent it may have been intended to have some functional benefits when first conceived a trademark can become non-functional over time. *Eco Mfg. LC v. Honeywell Int'l Inc.*, 357 F.3d 649, 653 [69 USPQ2d 1296] (7th Cir. 2003).[39]

However, as mentioned, Respondent does not explain *how* the "Color Line Trademark" became nonfunctional over time, or how the Court's rationale in *Honeywell* applies in this case. In addition, we observe that the Court in *Honeywell* did not decide, or even opine upon, the ultimate issue of functionality of the trademarked round thermostat under consideration therein, although it did suggest three different ways in which such a thermostat could be functional.

Respondent also argues that

> Poly-America relies in large part on a single portion of a much larger and complex claim in an old patent filed by Steven Ausnit, former president for the entities which were predecessors in interest to [Respondent]. However, there are many problems with relying on this phrase in a patent claim. First, [Respondent] has acknowledged that Mr. Ausnit initially believed there would be some functional advantage. However, by Mr. Ausnit's own testimony, it quickly became clear to him that there was no such advantage. [citations omitted]. Second, the reference to color is but one iteration in a larger claim. The invention was *not* a line of color or even covering a completed bag, but instead a closure mechanism that might happen to have color. Moreover, it discloses color in the flange – or in the upper grip portion of the bag, not in the closure – and discloses it as contrasting with the closure itself. It is ambiguous as to how the color is used under the invention. Under any basic reading of the resulting claim, a single line of color at or near the top of a completed bag (as is described in the '120 Registration), does not infringe this patent. [Respondent] (and its predecessors in interest) have not sought trademark protection to improperly lengthen their protection over the invention described in the patent. Instead, they have acquired and

---

[39] 94 TTABVUE 32-3.

enforce trademark protection for the non-functional element of the invention at issue – the Color Line Trademark. Finally, it is not clear from the patent file history as to why the reference to color was allowed in the claim – despite [Petitioner] attempting to read further analysis into it. The record shows that the USPTO repeatedly rejected this portion of the claim as non-functional, stating that "[c]oloring an element to be grasped is obviously a matter of design or skill." [citations omitted]. After apparently an oral interview with the Examiner the color phrase of the claim was ultimately allowed. The record does not show why or how the phrase was allowed, and reading any intent or change of mind by the Examiner is inappropriate.[40]

However, as discussed above, claim 6 was allowed nevertheless and Respondent's predecessors never disclaimed it, but rather touted the functional benefits of the bags' colored flange in advertisements and enjoyed the protections it conferred for the life of the patent.[41] Respondent's convenient argument that Steven Ausnit, one of the co-inventors named in the '434 patent, subsequently realized that color confers no functional advantage is not sufficient to overcome the fact that its predecessors sought and obtained patent protection for, *inter alia*, a line of color and highlighted both the color and the patent therefor in promotional materials. "A patent shall be presumed valid. . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. Petitioner has shown that Respondent's own predecessors argued to the USPTO that the color feature at issue served a utilitarian function and, in the face of resistance from the patent examiner, insisted that the patent issue without a disclaimer of the color feature. That being established, the mere argument that Mr. Ausnit since changed

---

[40] 94 TTABVUE 42-3.

[41] 66 TTABVUE 44, 102-110.

his mind is not sufficient to outweigh the evidence of functionality. Rather, Respondent must prove that the color does not confer a functional advantage on the invention.

Second, it is of no moment that the invention claimed in the '434 patent was a closure mechanism for a bag or pouch that included "color in the flange – or in the upper grip portion of the bag, not in the closure."[42] The significance of claim 6 is the "flange being colored differently than the strips to facilitate identification of the flange and assist in separation of the strips."[43] The fact that the color was part of a larger claim involving a bag or pouch does not reduce its significance, particularly in light of the reliance by Respondent's predecessors on the color recited in claim 6. We further disagree with Respondent's contention that ambiguity exists as to the manner in which color was used in the invention that is the subject of the '434 patent. Claim 6 clearly describes a flexible closure consisting of a pair of flexible closure strips having interlocking ribs and grooves with a separating flange colored differently than the strips to facilitate identification of the flange and separation of the strips. With regard to Respondent's assertion that it has not sought to improperly lengthen the protection conferred by the '434 patent, we need not and do not make any finding as to Respondent's intent in obtaining registrations for the involved marks. A determination of Respondent's intent is not necessary for our functionality analysis. Similarly, we need not consider why the Patent Examiner accepted the sixth claim

---

[42] 94 TTABVUE 42-3.

[43] '434 patent, column 6, lines 29-46.

thereof. While the Examiner initially rejected the claim on the basis that "[c]oloring an element to be grasped is obviously a matter of design or skill,"[44] Respondent's predecessor, as discussed above, persuasively argued that the invention requires coloration of a flange member, which "is not shown by the prior art, affords an advantage, and cannot be regarded as obvious without a basis in the prior art."[45] Claim 6 remained in effect for the duration of the '434 patent and its plain language defines the features of the involved trademarks.

Finally, we note that Respondent's argument that the marks would not infringe the '434 patent were it still alive is irrelevant. The issue is whether anything in the patent, its specification, or statements made in prosecution disclose the functionality of the marks. Here, they clearly do. As the Federal Circuit has written, "readability of patent claims on structure is not [the] test of functionality for trademark purposes." *In re Bose Corp.*, 772 F.2d 866, 227 USPQ 1, 6 (Fed. Cir. 1985) (citation omitted); *see also In re Shenango Ceramics, Inc.*, 362 F.2d 287, 150 USPQ 115, 120 (CCPA 1966) ("Although the patent claimed the middle or vibration-throttling rib in combination with a pedestal or foot rib, the result is no different where the configuration is present on a plate having no pedestal rib. … Thus the result here is not dependent on the precise scope of the patent claims.").

---

[44] 66 TTABVUE 74.

[45] 66 TTABVUE 85.

Respondent argues in addition that

> [Petitioner] has produced no evidence that consumers turn to color to instruct them where the bag opens, or whether or not the bag is closed.[46]

Petitioner has established functionality under *Inwood* based upon the sixth claim in the '434 patent. Therefore, it is unnecessary for Petitioner to produce evidence that consumers recognize color as a functional feature of the goods identified in the involved registrations. *Cf. TrafFix*, 58 USPQ2d at 1007 ("The Lanham Act, furthermore, does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller. . . . . MDI cannot gain the exclusive right to produce sign stands using the dual-spring design by asserting that consumers associate it with the look of the invention itself."); *In re RM Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984) ("Evidence of distinctiveness is of no avail to counter a de jure functionality rejection."); *Morton Norwich*, 213 USPQ at 17 (whether consumers perceive the feature as a source-identifier and the issue of functionality "must . . . be kept separate from one another."). Petitioner need not present evidence fitting within all four categories in *Morton-Norwich*. Petitioner having established that the involved marks are functional, it was incumbent upon Respondent to advance evidence sufficient to prove nonfunctionality. *See Valu Eng'g*,

---

[46] 94 TTABVUE 43.

61 USPQ2d at 1429; *In re Howard Leight Indus. LLC,* 80 USPQ2d at 1509 n.7. Respondent has failed to do so.[47]

V. Conclusion on Functionality.

We have carefully considered the evidence properly made of record pertaining to the issue of functionality, in particular, the testimony and evidence bearing on Respondent's '434 patent, as well as all of the parties' arguments related thereto. We conclude, based on the preponderance of the evidence, that Respondent's registered configurations are functional.

**Decision**: The petition for cancellation is granted. Registration Nos. 0946120 [colored line mark], 1055114 [zipper flange mark] and 1294243 [rollstock mark] will be cancelled in due course.

In light of our determination herein, we need not and do not reach the issue of whether Respondent, through its licensing practices, has abandoned the mark in Registration No. 0946120 [colored line mark] under Section 14(3) of the Trademark Act, 15 U.S.C. § 1064(3), has caused the mark to become the generic indicator for

---

[47] Because we have found under *Inwood* that the design features for which Respondent has obtained trademark protection are necessary to the functioning of Respondent's goods, we need not address the additional *Morton-Norwich* categories. *TrafFix Devices*, 58 USPQ2d at 1006; *see also In re Becton, Dickinson & Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1378 (Fed. Cir. 2012).

the identified goods, or has undercut its ability to serve as an indicator of a *single* source.[48]

---

[48] Generally, when a company sells to third parties for re-sale under the third parties' marks rather than under the manufacturer's mark, that circumstance cripples any attempt to show that consumers uniquely associate the mark with one source, i.e., the manufacturer. *See, e.g.*, *Quaker State Oil Ref'g Corp. v. Quaker Oil Corp.*, 453 F.2d 1296, 172 USPQ 361, 363 (CCPA 1972); *Mine Safety Appliances Co. v. Elec. Storage Battery Co.*, 405 F.2d 901, 160 USPQ 413, 415 (CCPA 1969); *In re Hillerich & Bradsby Co.*, 204 F.2d 287, 97 USPQ 451, 454 (CCPA 1953).