This Opinion Is a
Precedent of the TTAB

Hearing: September 27, 2017                    Mailed: March 30, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Grote Industries, Inc.*

*v.*

*Truck-Lite Co., LLC f/k/a/ Truck-Lite Co., Inc.*

_____

Opposition No. 91196923 and Cancellation No. 92053498 (Consolidated)

_____

Daniel J. Lueders and Steve Zlatos of Woodard, Emhardt, Moriarty, McNett & Henry
    LLP, for Grote Industries.

Carl A. Hjort, III and Byron A. Bilicki of The Bilicki Law Firm, P.C.,
    for Truck-Lite Co., LLC f/k/a Truck-Lite Co., Inc.

_____

Before Kuczma, Hightower, and Larkin,
    Administrative Trademark Judges.

Opinion by Hightower, Administrative Trademark Judge:

In this consolidated proceeding, the Board must determine whether the defendant

may obtain and maintain registrations of a pattern for truck lights. The parties are

direct competitors Opposer/Petitioner Grote Industries, Inc. (Grote) and Applicant/

Registrant Truck-Lite Co., LLC, formerly known as Truck-Lite Co., Inc. (Truck-Lite).

The pleaded grounds for both opposition and cancellation are functionality under

Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5); lack of acquired

distinctiveness under Section 2(f) of the Act, 15 U.S.C. § 1052(f); and fraud.

Grote petitions to cancel Truck-Lite's registration for the following configuration for "lighting products for vehicles, namely, a combined stop-turn-tail lamp[1]" in International Class 11:[2]



The registration issued on the Principal Register pursuant to Trademark Act Section 2(f) on the basis of a claim of acquired distinctiveness as to the mark as a whole, which is described in the registration as follows:

> The mark consists of the configuration of a stop/turn/tail light, which consists of a circular base and a circular cover portion. The circular cover portion of the stop/turn/tail light consists of an arrangement of circular patterns integrally formed within the cover. The circular patterns form individual lens portions arranged above light emitting diode (LED) lights located within the interior of the stop/turn/tail light. There are six lenses and six corresponding LED's. A center lens portion, which has a

---

[1] These types of goods are variously referred to in the record as "stop-turn-tail" and "stop-tail-turn" lamps, at times with slashes in place of dashes. We use the terms interchangeably. A stop-tail-turn lamp is "[a] lamp used on the back of a vehicle to indicate to the other vehicles, primarily behind them, whether the vehicle is stopping, turning, or if the lights are on just so that it's visible, that's the tail function. Q. So at night if a semi is driving down the road with its headlights on, on the back it's the tail lamp? A. Correct. . . . Q. Is it sometimes referred to in your industry as a stop-turn-tail lamp? A. Yes." John Grote Test. at 10:23-11:13, 84 TTABVUE 11-12; *see also* Robert Ives Test. at 27:10-18, 86 TTABVUE 28.

[2] Registration No. 3483147, issued August 12, 2008; declaration of use under Trademark Act Section 8, 15 U.S.C. § 1058, accepted June 14, 2014.

pentagonal perimeter, is located in the center of the cover. Each of the five additional lens portions are arranged around the pentagonal perimeter of the center lens portion. A corresponding LED is positioned below each lens portion. When illuminated, the light emitted from the six LED's shines through the corresponding lens portions and the aforementioned pattern of the LED's and lens portions is visible.

In addition, Grote opposes registration of the following configuration for "electric lighting fixtures, namely, lights for vehicles" in International Class 11:[3]



The application seeks registration of the configuration on the Principal Register under Section 2(f) on the basis of a claim of acquired distinctiveness as to the mark as a whole, which is described in the application as follows:

> The mark consists of an arrangement of six light emitting diodes (LED's) with one LED located in the center of a pentagonal pattern as applied to a circuit board sold as an integral component of a vehicle light. Additional structure is shown in broken lines to give context, but does not form any part of the mark.

---

[3] Application Serial No. 77618319 was filed November 20, 2008, based on Applicant's allegation of first use and use in commerce as of October 31, 2000, pursuant to Trademark Act Section 1(a), 15 U.S.C. § 1051(a).

Assignment of both the subject registration and application from Truck-Lite Co., Inc. to Truck-Lite Co., LLC, following a merger effective December 3, 2010, was recorded with the USPTO Assignment Recordation Branch on February 1, 2011 at Reel/Frame 4465/0572.

Color is not claimed as a feature of either mark, which Truck-Lite calls the "Penta-Star Pattern." The same specimen was submitted with the opposed application, the application that matured into the subject registration, and Truck-Lite's affidavit of continued use under Section 8 of the Trademark Act, 15 U.S.C. § 1058, as follows:



The consolidated proceeding is fully briefed, with Opposition No. 91196923 as the "parent" case, and an oral hearing was held on September 27, 2017. We sustain the opposition and grant the petition for cancellation, finding the applied-for and registered product configurations not inherently distinctive and without proof of acquired distinctiveness under Section 2(f).

I.   Evidentiary Objections

Grote lodged objections to certain of Truck-Lite's evidence in an appendix to its reply brief. 113 (confidential) and 114 TTABVUE 27-30. Objections raised for the first time in a reply brief are untimely because they effectively foreclose the adverse party from responding to the objections. *Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La Michoacana Inc.*, 98 USPQ2d 1921, 1928 (TTAB 2011); *Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1104 (TTAB 2007). Therefore, we deem Grote's objections to be waived.

In its statement of objections, Truck-Lite objects to numerous portions of the trial testimony of two of Grote's witnesses, Art Hernandez and John Grote, most in testimony designated confidential and filed under seal, and to one exhibit also filed under seal. 108 (confidential) and 109 TTABVUE. Some are procedural objections Truck-Lite is estopped from raising at final hearing due to its failure to timely assert them during the testimony depositions. *See* Trademark Trial and Appeal Board Manual of Procedure (TBMP) §§ 707.03(c) & n.2, 707.04 (2016).[4]

Although we have carefully considered each of Truck-Lite's objections, because much of the evidence targeted by Truck-Lite's objections is designated confidential and none is material to our outcome-determinative findings of fact, we will not discuss any of the objections in detail. Suffice it to say that we have considered all of the evidence of record, keeping in mind Truck-Lite's objections and Grote's responses, and have accorded whatever probative value the subject testimony and exhibits merit. We also remind the parties that our proceedings are tried before judges not likely to be easily confused or prejudiced. Objections to trial testimony on bases more relevant to jury trials are particularly unnecessary in this forum. *See, e.g.*, *U.S. Playing Card Co. v. Harbro LLC*, 81 USPQ2d 1537, 1540 (TTAB 2006) ("[B]ecause an opposition is akin to a bench trial, the Board is capable of assessing the proper evidentiary weight to be accorded the testimony and evidence, taking into account the imperfections surrounding the admissibility of such testimony and evidence.").

---

[4] This proceeding was tried in 2016, before the Trademark Rules of Practice were amended as of January 14, 2017. Citations are to the rules that were in effect in 2016 and the corresponding edition of the TBMP.

II.   Record

The record consists of the pleadings and, without any action by the parties, the files of the involved application and registration. Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1). The record also comprises:

A.   Grote's Evidence

Grote made of record a notice of reliance with Exhibits 1-83 (50 (confidential) and 51 TTABVUE) and the trial testimony, with exhibits (filed at 83 (confidential) and 89 TTABVUE), of the following witnesses:

- John Grote, Grote's Vice President of Marketing, 78 (confidential) and 84 TTABVUE;

- Art Hernandez, Grote's Vice President of Engineering, 79 (confidential) and 85 TTABVUE;

- Robert Ives, former Vice President of Marketing and current Vice President of Business Development for Truck-Lite, 80 (confidential) and 86 TTABVUE;

- Greg Pond, former Project Engineer and current Materials Manager for Truck-Lite, 81 (confidential) and 87 TTABVUE; and

- Phil Roller, retired Chief Research Engineer for Truck-Lite, 82 (confidential) and 88 TTABVUE.

B.   Truck-Lite's Evidence

Truck-Lite states in a cover letter that it mailed documents listed in its confidential and non-confidential notices of reliance to the Board on two compact discs on June 10, 2016, the day before its testimony period closed. 77 TTABVUE (confidential). The Board, however, has not accepted submissions on compact disc since 2007. *See* Trademark Rule 2.126, 37 C.F.R. § 2.126; *Hunter Indus., Inc. v. Toro Co.*, 110 USPQ2d 1651, 1654 & n.5 (TTAB 2014); TBMP § 106.03 (2016). Rather,

when this proceeding was tried in 2016, all submissions were required to be on paper or through ESTTA, the Electronic System for Trademark Trials and Appeals.[5] Because the documents referenced in Truck-Lite's notices of reliance were not submitted in a proper form, they have not been considered.

On December 1, 2016, nearly six months after the close of its testimony period, Truck-Lite submitted via ESTTA the transcripts of four discovery depositions of two of Grote's witnesses designated pursuant to FED. R. CIV. P. 30(b)(6), both of whom also were trial witnesses for Grote:

- John Grote, deposed February 1, 2013 (101 TTABVUE) and March 7, 2014 (102 TTABVUE); and

- Art Hernandez, deposed March 7, 2014 (103 TTABVUE) and July 18, 2014 (104 TTABVUE).

Each of these transcripts is filed under seal and listed in Truck-Lite's confidential notice of reliance and brief. 77 TTABVUE 12; 138 TTABVUE 11-12.

Copies of oral *testimony* transcripts may be filed with the Board any time before the case is submitted for final decision. *See* Trademark Rule 2.123, 37 C.F.R. § 2.123; *Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1115 (TTAB 2009); *Hewlett-Packard Co. v. Human Performance Measurement, Inc.*, 23 USPQ2d 1390, 1393 n.6 (TTAB 1991); TBMP § 703.01(k) (2016). There is, however, no provision permitting submission of a *discovery* deposition transcript admissible pursuant to notice of reliance after a party's testimony period has closed. Trademark Rule

---

[5] The 2017 rules amendments require all evidence to be filed electronically through ESTTA. An exception inapplicable to Truck-Lite's notices was and continues to be made for multimedia evidence that by its nature cannot be submitted through ESTTA, such as audio and video recordings of commercials.

2.120(j)(3)(i), 37 C.F.R. § 2.120(j)(3)(i) (Rule 2.120(k)(3)(i), as amended after trial in 2017) ("The notice of reliance and the material submitted thereunder should be filed during the testimony period of the party which files the notice of reliance."); *see also* TBMP § 704.09 (2016) ("A discovery deposition that may be offered in evidence under 37 CFR § 2.120(j) may be made of record by filing, during the testimony period of the offering party, the deposition or any part thereof with any exhibit to the part that is filed, together with a notice of reliance."). The discovery transcripts therefore are untimely. However, because Grote did not object to their untimely submission – and, with respect to the first discovery deposition of John Grote, treated the transcript as if it were of record by quoting and discussing it in its reply brief (*see* Reply Brief at 13-15, 114 TTABVUE 14-16) – we have considered the four discovery deposition transcripts.

Truck-Lite properly made of record the trial testimony of the witnesses listed below, the first two of whom are Truck-Lite executives also called as trial witnesses by Grote:

- Robert Ives, 97 (confidential), 127, and 137 TTABVUE;

- Greg Pond, 98 (confidential), 125, 126 (confidential), and 137 TTABVUE;

- Brad Van Riper, Truck-Lite's Chief Technology Officer and Senior Vice President, 99 (confidential), 125, 126 (confidential), and 137 TTABVUE; and

- John Hoover, Truck-Lite's Director of North American Fleet Sales, 100 and 134 (both confidential), 135, and 137 TTABVUE.

Exhibits to this testimony are at 129 TTABVUE (confidential) and 130-33 TTABVUE.

There are multiple deposition transcripts of record for several witnesses. Transcript citations are identified by name and TTABVUE docket entry number.

As noted *supra*, much of the evidence proffered by both parties has been designated confidential and filed under seal. The great majority of the trial exhibits Grote filed under seal are publicly disclosed elsewhere in the record. At oral hearing, the Board informed the parties that their designations were excessive and invited them to resubmit properly designated evidence within 15 days. Only Truck-Lite did so, resubmitting its brief (138 TTABVUE) and transcripts from its four trial witnesses (137 TTABVUE), with certain testimony unredacted and exhibits made public.

Board proceedings "are designed to be transparent to the public and the contents of proceeding files publicly available. The improper designation of materials as confidential thwarts that intention." *Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1461 (TTAB 2014). The Board may disregard improper confidentiality designations or not consider the improperly designated matter in rendering its decision. *Noble House Home Furnishings, LLC v. Floorco Enterprises, LLC*, 118 USPQ2d 1413, 1416 n.21 (TTAB 2016) ("In rendering our decision, we will not be bound by Respondent's designation. . . . [W]e will treat only testimony and evidence that is truly confidential or commercially sensitive as such."); TBMP § 412.01(c) (2016).[6]

Accordingly, we have discussed only in general terms truly confidential evidence submitted under seal and not redesignated or publicly disclosed elsewhere in the record.

---

[6] This practice was codified in Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g), in the 2017 amendments.

III.    Grote's Standing

Standing is a threshold issue that must be proven by the plaintiff in every *inter partes* case. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *John W. Carson Found. v. Toilets.com Inc.*, 94 USPQ2d 1942, 1945 (TTAB 2010). The parties are competitors in the truck light industry, and Truck-Lite admitted that Grote is one of its competitors in ¶ 1 of each of its answers. 4 TTABVUE 3 (in the opposition to the application); 8 TTABVUE 3 (in the cancellation proceeding for the registration). Grote therefore presumptively has an interest in the outcome of these proceedings beyond that of the public in general. *See Books on Tape Inc. v. Booktape Corp.*, 836 F.2d 519, 5 USPQ2d 1301, 1302 (Fed. Cir. 1987); *Kistner Concrete Prods. Inc. v. Contech Arch Techs. Inc.*, 97 USPQ2d 1912, 1918 (TTAB 2011); *Plyboo Am. Inc. v. Smith & Fong Co.*, 51 USPQ2d 1633, 1634 (TTAB 1999). We find that Grote has established its standing to bring these consolidated proceedings.

IV.    Functionality

We begin by assessing whether Truck-Lite's product design is functional and therefore incapable of serving as a trademark. We are cognizant that Truck-Lite presents its design differently in the subject registration and application, and that each identifies slightly different goods; the subject registration shows the mark

for "lighting products for vehicles, namely, a combined stop-turn-tail lamp,"

while the subject application shows the mark        for "electric lighting fixtures,

namely, lights for vehicles." Nonetheless, the essence of the claimed marks depicted in the two drawings comprises the same Penta-Star Pattern design, shown illuminated in the specimen of use for both the registration and application:

 and we refer to them in the singular as the "Penta-Star Pattern" or "mark."

We also refer to the goods in some instances as "truck lights" or "vehicle lights" for convenience and to reflect the focus of the evidence, although the goods are identified more specifically in the registration and more broadly in the application.

Section 2(e)(5) of the Trademark Act provides that registration of a product design may be denied if it "comprises any matter that, as a whole, is functional." Generally, a product design or product feature is considered to be functional

> "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161 (1995) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982)). Expanding upon the meaning of this phrase, we have observed that a functional feature is one the "exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." (quoting *Qualitex*, 34 USPQ at 1164).

*TrafFix Devices Inc. v. Mktg. Displays Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1006 (2001).[7]

---

[7] Truck-Lite's assertion that, by focusing its briefing on the *Morton-Norwich* factors, Grote "conceded that the *Inwood* standard does not apply" is incorrect. Truck-Lite Brief at 24, 138 TTABVUE 25. The standard for functionality set forth in the Supreme Court's decisions in *Inwood* and its progeny applies in every functionality case.

"The Supreme Court has consistently proceeded with caution in according trademark protection to product designs." *Kistner Concrete*, 97 USPQ2d at 1919. Nonetheless, product design may be protected and registered as a trademark subject to certain conditions.

In making our determination of functionality under *Inwood*, we are guided by the analysis first applied in *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982). *See Valu Eng'g Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1427 (Fed. Cir. 2002); *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1489 (TTAB 2017); *Poly-America, L.P. v. Illinois Tool Works Inc.*, 124 USPQ2d 1508, 1513 (TTAB 2017); *In re Change Wind Corp.*, 123 USPQ2d 1453, 1456 (TTAB 2017). *Morton-Norwich* identifies the following inquiries or categories of evidence as helpful in determining whether a particular design is functional: (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product. *Morton-Norwich*, 213 USPQ at 15-16.

The Supreme Court has made clear that if functionality is properly established under *Inwood*, further inquiry into facts that might be revealed by a full analysis of all types of *Morton-Norwich* evidence will not change the result. *TrafFix*, 58 USPQ2d at 1006 ("Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature."); *see also Poly-America*, 124 USPQ2d at 1514.

Functionality is a question of fact, and depends on the totality of the evidence. *Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 32 USPQ2d 1120, 1122 (Fed. Cir. 1994). In this case, the evidence presented to address the question of whether the proffered trade dress is "essential to the use or purpose of the article" follows the *Morton-Norwich* categories.

A. Whether a Utility Patent Discloses Utilitarian Advantages of the Design

A utility patent is strong evidence that the claimed features for which an applicant or registrant seeks trademark protection are essential to the use or purpose of the article (or affect the cost or quality of the item), and may constitute sufficient evidence of functionality standing alone. *TrafFix*, 58 USPQ2d at 1005. A utility patent need not "claim the exact configuration for which trademark protection is sought in order to undermine an applicant's assertion that an applied-for mark is not de jure functional." *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1377 (Fed. Cir. 2012); *In re Change Wind*, 123 USPQ2d at 1456; *cf. In re Loggerhead Tools, LLC*, 119 USPQ2d 1429, 1432 (TTAB 2016) (comparing claimed mark to both utility patent and design shown in design patent).

Truck-Lite owns U.S. Patent No. 6,654,172 for its product (the '172 patent),[8] which issued on November 25, 2003 and includes, among others, the following drawings:

---

[8] 89 TTABVUE 320-27. (Numerous copies of Truck-Lite's patent filings are of record.) The listed inventors are Gregory Pond and Phillip C. Roller.



FIG. 2



FIG. 4

In the patent's "Brief Description of the Drawings," Figure 2 "is a top view of one embodiment of the present invention," while Figure 4 depicts a top view of the diode array "utilized in one embodiment of the invention."[9]

The language of the patent makes clear that the drawings show only one of multiple possible embodiments of the invention owned by Truck-Lite. What is claimed requires "at least one light emitting diode,"[10] but not necessarily six. Although other aspects of the lamp assembly are claimed, the specific pattern of the lights is not:

> As is shown in FIG. 4, one embodiment of the invention utilizes six light emitting diodes 100. It should be understood that any number of light emitting diodes can be used, depending on the standards or specifications one attempts to meet. In the embodiment of the invention shown here, lamp 10 satisfies Society of Automotive Engineers Standards . . . as adopted by the U.S. Department of Transportation.[11]

Truck-Lite argues that "the Penta-Star design is a non-functional, ornamental pattern incidentally disclosed, and certainly not claimed, in the '172 patent." Truck-Lite Brief at 25, 138 TTABVUE 26. Because the design is not claimed in the '172

---

[9] 89 TTABVUE 321, 326.

[10] 89 TTABVUE 327.

[11] 89 TTABVUE 326-27.

patent, Truck-Lite argues, the patent cannot be used to establish functionality. *Id.* at 24, 138 TTABVUE 25. Truck-Lite invokes the following proposition from *TrafFix*, 58 USPQ2d at 1007:

> In a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs, a different result might obtain. There the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent.

Truck-Lite also introduced witness testimony that at least four six-diode designs were considered, that the Penta-Star Pattern was chosen because it was "the most aesthetically pleasing" among the available diode pattern or design options for its invention, and that the design itself provides no utilitarian advantage.[12]

According to Truck-Lite's Provisional Patent Application No. 60/229,229, filed August 31, 2000 (as well as witness testimony and other evidence), Truck-Lite invented its stop/turn/tail lamp featuring the Penta-Star Pattern to take advantage of improved lighting known as SnapLED technology made by a third party, as discussed further *infra*.[13] Other goals of the invention listed in the provisional patent application include:

---

[12] *See* Pond Test. at 53:10-18, 53:22-54:1, 87 TTABVUE 54-55; Ives Test. at 8:12-22, 103:2-11, 127 TTABVUE 9, 104.

[13] 51 TTABVUE 328. A certified copy of the provisional patent application submitted with Grote's notice of reliance is at 51 TTABVUE 323-53. Although the lights arranged in the Penta-Star Pattern in the array incorporated into Truck-Lite's goods are made by Lumileds, *see, e.g.*, 51 TTABVUE 95-99, Lumileds is not a party to this proceeding and, because Grote's pleadings do not challenge whether Truck-Lite owns the mark at issue, we do not consider whether trademark rights in the pattern are owned by anyone other than Truck-Lite.

- It is an additional object of the present invention to provide a combined stop/tail/turn/clearance[14] lamp for vehicles that distributes light emitting from SnapLED™ diodes to simultaneously meet Society of Automotive Engineers Standards J585e (September 1997), J1398 (May 1995), J592e (July 1972).

- It is a further object of the present invention to provide a lens for a combined stop/tail/turn/clearance lamp for vehicles that has a unique combination of optical elements designed to distribute light over a specified range and at a specified intensity.[15]

The provisional patent application is incorporated in Truck-Lite's '172 patent by reference.[16] As part of the prosecution history, the provisional patent application "constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct . . . ." *Hockerson-Halberstadt Inc. v. Avia Grp. Int'l Inc.*, 222 F.3d 951, 55 USPQ2d 1487, 1491 (Fed. Cir. 2000).

Two of the drawings from Truck-Lite's provisional patent application are:


FIG. 1


FIG. 2

---

[14] "Rear clearance lamps" show a vehicle's width. *Truck-Lite Lighting User's Guide* at 34, Grote Trial Exhibit 77, 89 TTABVUE 588, and Truck-Lite Trial Exhibit ZZ, 130 TTABVUE 271.

[15] 51 TTABVUE 332.

[16] 89 TTABVUE 326 (priority statement).

The descriptions of these drawings in the provisional patent application refer to views of "a preferred embodiment of the present invention."[17] A configuration of the lights corresponding to the Penta-Star Pattern is described as "the most preferred embodiment."[18] The utility patent application also states that "the preferred embodiment of the invention utilizes six light emitting diodes. It should be understood that any number of light emitting diodes can be used, dependent on the standards/specifications one is attempting to meet."[19] Under "Best Mode for Carrying Out the Invention," the provisional patent application states the following:

> For the purpose of promoting an understanding of the present invention, reference will be made to an embodiment of a circular stop/tail/turn/clearance lamp as illustrated in the drawings. It will nevertheless be understood that no limitations of the scope of the invention is thereby intended, such alterations as changing the geometry of the invention or changing the placement of the various optical elements of the lens could provide additional alterations which would fall within the spirit and scope of the invention described herein. Some of the possible alterations will be mentioned in the following description.[20]

We consider the entirety of a patent – both claims and disclosures – and have found functional applied-for marks depicting the preferred embodiment described in a utility patent. *See, e.g., In re Heatcon, Inc.,* 116 USPQ2d 1366, 1372-73, 1378 (TTAB 2015) (finding arrangement of features to be functional, observing that the disclosures and preferred embodiments include aspects directed to the placement and

---

[17] 51 TTABVUE 334.

[18] 51 TTABVUE 337.

[19] *Id.*

[20] 51 TTABVUE 335.

arrangement of the functional elements); *Kistner Concrete*, 97 USPQ2d at 1923, 1931; *In re Howard Leight Indus. LLC*, 80 USPQ2d 1507, 1515 (TTAB 2006); *In re Edward Ski Prods.*, 49 USPQ2d 2001, 2003 (TTAB 1999); *In re Lincoln Diagnostics Inc.*, 30 USPQ2d 1817, 1823 (TTAB 1994) (finding applicant's design not identical to the design of the preferred embodiment depicted in the patent, but substantially similar in appearance and function), *aff'd mem.*, 41 F.3d 1519. Nonetheless, the provisional patent application also makes clear that "any number of light emitting diodes can be used" in the invention. As Professor McCarthy cautions:

> [A] utility patent must be examined in detail to determine whether the disclosed configuration is really primarily functional or just incidentally appears in the disclosure of a patent. There is no doubt that many nonfunctional shapes and configurations happen to be described or pictured as an incidental detail in functional patents.

1 MCCARTHY § 7:89.30. For example, in *In re Udor U.S.A. Inc.*, 89 USPQ2d 1978, 1982 (TTAB 2009), the Board found that the round shape of a spray nozzle head did not have inherent utilitarian value based on the claims of patented technology, stating in part: "While it is true that all the embodiments depicted in drawings in the patent do involve a round head, none of the utility patent claims refers to a rounded spray nozzle head."

We agree with Truck-Lite that the Penta-Star Pattern is only incidentally disclosed in the '172 patent, which claims that "at least one light emitting diode" must be used.[21] Truck-Lite presented evidence that the Penta-Star Pattern was chosen for

---

[21] 89 TTABVUE 327.

aesthetic reasons from among other six-diode designs,[22] and the utility patent (including the provisional patent application) makes clear that although the design is the "preferred embodiment" for the light, any number of diodes can be used. Similarly, although the '172 patent drawings show and the abstract describes a lens "composed of six different optical units surrounded by Fresnel rings,"[23] nowhere in the patent are any advantages of the six-diode design specifically disclosed.[24] This case is thus distinguishable from *Kistner Concrete*, 97 USPQ2d at 1923, in which the Board found that "each of the elements comprising the trademark is an essential element of the patent." Further, in contrast to *Heatcon,* the patent does not disclose any utilitarian aspect of the specific placement of the optical elements.

We find that Truck-Lite's patent does not show that the Penta-Star Pattern is essential to the use or purpose of the article.[25]

B.      Whether Advertising Touts the Design's Utilitarian Advantages

We find that Truck-Lite's advertising does not promote utilitarian advantages arising from the Penta-Star Pattern. Grote cites Truck-Lite's catalog, which states in most relevant part that the "SnapLED array dissipates heat more effectively,

---

[22] *See, e.g.*, Ives Test. at 8:12-22, 137 TTABVUE 9.

[23] "Fresnel rings [ ] function as refracting surfaces, sending parallel rays of light emitted from the light emitting diodes to a common focus." '172 patent, 89 TTABVUE 326.

[24] 89 TTABVUE 321, 326.

[25] We find Truck-Lite's U.S. Design Patent No. D572,856 is not probative as to the functionality of Truck-Lite's vehicle light. 89 TTABVUE 328-34. The design patent is for a different kind of lighting product, a work lamp, which Truck-Lite's catalog characterizes as an "all purpose spot lamp." Grote Trial Exhibit 76, 89 TTABVUE 554. *See, e.g.*, *In re Becton, Dickinson & Co.*, 102 USPQ2d at 1377 (stating that, "[a]bsent identity between the design patent and the proposed mark, the presumption [that the design patent shows the design in the mark is nonfunctional] loses force").

resulting in greater light output."[26] Truck-Lite submitted evidence, however, crediting the metal substrate rather than the pattern with dissipating heat. Inventor Greg Pond testified at trial as follows:

> Q. And that went into your thinking on the arrangement of the LEDs in Exhibit 115, the heat management and the position of the LEDs as they affected heat management?
>
> A. In this case the SnapLED technology is quite good at pulling heat away from the LEDs because of the metal substrate. Often what you have is simply a solder joint followed by a thin trace. Also with the SnapLED you have a -- the substrate is all metal, it's a good heat sink to pull heat away and to hold it.
>
> Q. So you are saying heat management wasn't a problem with this lamp?
>
> A. No. Heat management is a consideration, but I don't recall thinking that we were limited in placement by heat management. As with any light, it would have to be proven after the fact.[27]

Consistent with this testimony, the other named inventor of Truck-Lite's product, Phil Roller, testified with regard to the same statement in Truck-Lite's catalog:

> Q. Does SnapLED array refer to the Penta-Star pattern of LEDs . . . ? Does it refer to the pattern of LEDs?
>
> A. No, it doesn't.
>
> Q. What does it refer to?
>
> A. It refers to the heat dissipation of the SnapLED array.
>
> Q. And by the SnapLED array, what do you mean by SnapLED array?

---

[26] 89 TTABVUE 549; *see also id.* at 551.

[27] Pond Test. at 42:19-43:12, 87 TTABVUE 43-44.

> A.    That was the metal substrate clinched SnapLED arrangement . . . .
>
> Q.    Is that metal substrate -- do you mean the SnapLED array is irrespective of the pattern of LEDs on that substrate?
>
> [Objection omitted.]
>
> A.    You could have other patterns.[28]

When questioned about this statement, Mr. Ives, Truck-Lite's Vice President of Business Development, similarly testified that, "as an LED warms up, its output tends to decrease somewhat, and metal will keep the LED cool and, therefore, keep the LED diode from degrading in its output."[29]

In sum, although Truck-Lite's advertising touts the heat-dissipating utilitarian advantage of the SnapLED array, its advertising of record does not directly attribute any such advantage to the Penta-Star Pattern specifically.

C.    Availability of Functionally Equivalent Designs

We next consider whether functionally equivalent designs are available to competitors. As the Board stated in *Change Wind*, 123 USPQ2d at 1462:

> Where relevant patents and/or advertising do not themselves establish functionality, the availability of alternate designs can "be a legitimate source of evidence to determine whether a feature is functional," *Valu Eng'g*, 61 USPQ2d at 1427, and may be relevant to show whether or not the design sought to be registered will hinder competition. *Morton-Norwich*, 213 USPQ at 16. *See also In re Bose Corp.*, [772 F.2d 866,] 227 USPQ [1,] 5-6

---

[28] Roller Test. at 92:17-93:13, 88 TTABVUE 93-94. As stated *supra*, Grote's testimony objections were not asserted in or with its opening brief and so were waived. *See* TBMP § 707.04 (2016) ("[B]y failing to preserve the objection in its brief on the case, or in an appendix to the brief on the case or in a separate statement of objections filed with the brief on the case, a party may waive an objection that was seasonably raised at trial.").

[29] Ives Test. at 98:17-99:2, 137 TTABVUE 99-100.

> [(Fed. Cir. 1985)] ("If the feature asserted to give a product distinctiveness is the best, or at least one, of a few superior designs for its de facto purpose, it follows that competition is hindered. *Morton-Norwich* does not rest on total elimination of competition in the goods.").

Nevertheless, the mere fact that other designs may be available does not necessarily mean that a design is not functional. *See Bose*, 227 USPQ at 5-6; *In re Van Valkenburgh*, 97 USPQ2d 1757, 1763 (TTAB 2011).

In this case, Truck-Lite submitted evidence during prosecution and at trial that many directly competing 4" diameter LED truck light patterns meeting the relevant photometric standards are marketed, ranging from a single diode to 56 diodes. To provide a few examples:



---

[30] Single-diode LED light offered by Peterson Manufacturing Company. Truck-Lite Exhibit EE, 130 TTABVUE 105-09.

[31] Four-diode LED light offered by Optronics. Truck-Lite Exhibit V, 130 TTABVUE 66-68.

[32] LED light offered by Optronics. Although Truck-Lite characterizes this design as "five red LEDs in the shape of a star," Truck-Lite Brief at 16, 138 TTABVUE 17, the evidence indicates that the light has 18 total diodes. Truck-Lite Exhibit S, 130 TTABVUE 57-59.

[33] Seven-diode LED light offered by Optronics. Truck-Lite Exhibit U, 130 TTABVUE 63-65.

[34] Seven-diode LED light offered by Peterson Manufacturing Company. Truck-Lite Exhibit CC, 130 TTABVUE 93-98.

[35] LED light with 21 diodes offered by Optronics. Truck-Lite Exhibit Y, 130 TTABVUE 75-77.

[36] LED light with 56 diodes offered by Maxxima. Truck-Lite Exhibit O, 130 TTABVUE 45-47.

Truck-Lite also submitted evidence that at least one competitor offers a truck light featuring a six-LED design configured around the perimeter of the light, without a

central diode, as shown at right.  [37]

Grote argues that it is insufficient that the alternative designs are functionally identical:

> Rather, the law requires proof from Truck-Lite that purported alternative designs "offer *exactly* the same features" as the asserted trade dress in order to show non-functionality; a manufacturer "does not have rights under trade dress law to compel its competitors to resort to alternative designs which have a different set of advantages and disadvantages."

Reply Brief at 8, 114 TTABVUE 9. The Federal Circuit has stated that the relevant question is whether the alternative designs work "equally well." *Valu Eng'g*, 61 USPQ2d at 1427 (quoting 1 MCCARTHY § 7:75 (4th ed. 2001)); *see also Textron, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d 1019, 224 USPQ 625, 629-30 (Fed. Cir. 1985) (criticizing the lack of evidence that the claimed design "has been or can be designed in an alternative manner and work as well, at an equivalent cost"); *Kistner Concrete*, 97 USPQ2d at 1928.

While the evidence here does not establish whether the different patterns of record offer varying advantages in terms of cost, voltage, longevity, etc., it does indicate that each of the competing lights meets applicable federal safety standards without

---

[37] Six-diode LED light offered by Maxxima. Truck-Lite Exhibit "I," 130 TTABVUE 27-29.

incorporating the Penta-Star Pattern. *See* Truck-Lite Brief at 33, 138 TTABVUE 34.

On balance, we find the availability of functionally equivalent designs to be neutral.

D. Whether the Design Results in a Comparatively Simple or Cheap Method of Manufacture

The record shows that, at the time Truck-Lite introduced its truck lights displaying the Penta-Star Pattern in 2000, LED technology was developing so that lights would be sufficiently bright with fewer diodes, reducing their costs. This is demonstrated in the following chart from *Truck-Lite Lighting User's Guide*, which shows a precipitous drop in the number of diodes required for stop/turn/tail lights between 1995 and 2005, from more than 60 to one diode:

[38]

The Penta-Star Pattern's use of six diodes thus was cheaper than existing designs needing more. Nonetheless, the technology has continued to develop such that today, a single bulb can be – and in some cases, as shown in the preceding subsection, is – used in competing products.

---

[38] *Truck-Lite Lighting User's Guide* at 47, Grote Trial Exhibit 77, 89 TTABVUE 601, and Truck-Lite Trial Exhibit ZZ, 130 TTABVUE 284.

In addition, Truck-Lite submitted testimony that the Penta-Star Pattern causes its lights to be more complicated to manufacture because the process cannot be fully automated and therefore takes longer and costs more. Greg Pond testified:

Q.    Can you describe the part that's not fully automated?

A.    The operator takes the lamp off of the assembly dial table, as we call it, and puts a lens on it and turns the lens to click it into proper position. The alignment between the lens and the housing has to be very accurate for the lamp to meet photometric requirements. So we have an operator click it in, and then a machine welds the lens to the housing.

Q.    Is that a critical step in the process?

A.    Yes.

Q.    Why?

A.    If the lens is not properly positioned, the lamp would not meet photometric requirements.

Q.    Does that step complicate the manufacturing process?

A.    It -- yes, in the sense that it makes it longer -- it takes longer to assemble the light and adds labor to the process.

Q.    Does that step increase the cost of the manufacturing process?

A.    Yes.

. . .

Q.    Does the unautomatable step, is it a result of using the Penta-Star pattern?

[Objection omitted.]

THE WITNESS:    The -- that process of attaching the lens is a result of the optics design, which is the result of the layout of the LEDs.[39]

---

[39] Pond Test. at 28:22-30:10, 137 TTABVUE 257-59.

Grote argues that Truck-Lite's lamp actually is simpler to manufacture because it uses the pre-made Lumileds SnapLED array incorporating the Penta-Star Pattern. *See* Reply Brief at 9-11, 114 TTABVUE 10-12. Although the sub-assembly manufactured by Lumileds was developed in conjunction with Truck-Lite engineers, Truck-Lite apparently does not have exclusive rights to it. *Id.* at 10, 114 TTABVUE 11; Truck-Lite Brief at 11 n.3, 138 TTABVUE 12. Grote did not submit evidence comparing the ease or cost of incorporating the sub-assembly with the Penta-Star Pattern with sub-assemblies featuring other designs. *See Morton-Norwich*, 213 USPQ at 16 ("It is also significant that a particular design results from a *comparatively* simple or cheap method of manufacturing the article.") (emphasis added). Thus, the record in this case, including evidence submitted under seal, does not support the contention that use of the Lumileds product renders manufacture simpler or less expensive. Rather, the record evidence suggests that use of the Penta-Star Pattern makes Truck-Lite's product more expensive and complex to manufacture, which suggests the design is nonfunctional.

In sum, we find that: (1) no patent specifically discloses the benefits of the Penta-Star Pattern; (2) the relevant advertising does not suggest a benefit arising from the pattern per se; (3) there appear to be alternative designs that satisfy federal regulations; and (4) there is no clear benefit as to either cost or ease of manufacture attributable to the pattern. Accordingly, on the basis of the totality of the evidence in this case, we find the design to be non-functional.

## V. Aesthetic Functionality

While Grote devoted the bulk of its briefing to its claim of utilitarian functionality, it also asserts that the Penta-Star Pattern is aesthetically functional. A mark will be deemed aesthetically functional, and therefore prohibited from registration by Section 2(e)(5) of the Trademark Act, if there is a "competitive need" for the feature. *See, e.g.*, *Brunswick*, 32 USPQ2d at 1122; *In re Florists' Transworld Delivery Inc.*, 106 USPQ2d 1784, 1787 (TTAB 2013) (stating that a feature is prohibited from registration "if the exclusive appropriation of that feature would put competitors at a significant non-reputation related disadvantage"). Grote rests its aesthetic functionality claim on two main arguments: Consumers prefer that the lights on their vehicles match each other, and "a pentagon is a common aesthetically pleasing geometric arrangement." Appeal Brief at 44, 92 TTABVUE 45; Reply Brief at 15, 114 TTABVUE 16.

Grote has not established a competitive need for use of the Penta-Star Pattern. The record shows that the parties and others offer equivalent lights with many diverse designs, including at least one that features six diodes arranged differently from the Penta-Star Pattern. Grote's argument that consumers want to be able to find matching replacement lights would apply to any design, even one whose light array design is solely arbitrary and whimsical and is known by customers to be a source identifier. Thus, this argument ultimately proves nothing. Grote also has not proven that the Penta-Star Pattern serves an aesthetic purpose independent of any source-identifying function. This case thus is distinguishable from *Brunswick*, 32 USPQ2d at 1124, in which our primary reviewing court found that the color black

served the nontrademark purpose of reducing the apparent size of outboard boat engines. Accordingly, we find that Grote has not established even a *prima facie* case of aesthetic functionality.

## VI.    Acquired Distinctiveness

Having found that Truck-Lite's proposed mark is not functional, we must determine whether the Penta-Star Pattern has acquired distinctiveness for truck lights and therefore is protectable as a mark under Trademark Act Section 2(f).

Because the configuration is a product design, it is not inherently distinctive, and can be registered as a mark only on a showing of acquired distinctiveness. *Wal-Mart Stores Inc. v. Samara Bros. Inc.*, 529 U.S. 205, 54 USPQ2d 1065, 1069 (2000) ("Consumers are aware of the reality that, almost invariably, even the most unusual of product designs – such as a cocktail shaker shaped like a penguin – is intended not to identify the source, but to render the product itself more useful or more appealing."); *AS Holdings, Inc. v. H & C Milcor, Inc.*, 107 USPQ2d 1829, 1837 (TTAB 2013). A mark has acquired distinctiveness "if it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Wal-Mart*, 54 USPQ2d at 1068 (quoting *Inwood*, 214 USPQ at 4 n.11); *see also Stuart Spector Designs Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 1554 (TTAB 2009) ("An applicant must show that the primary significance of the product configuration in the minds of consumers is not the product but the source of that product in order to establish acquired distinctiveness."). There is no fixed rule for the amount of proof necessary to demonstrate acquired distinctiveness, but the burden is

heavier for product configurations than for word marks. *Stuart Spector Designs*, 94 USPQ2d at 1554; *see also EFS Mktg. Inc. v. Russ Berrie & Co.*, 76 F.3d 487, 37 USPQ2d 1646, 1649 (2d Cir. 1996) ("[C]onsumers do not associate the design of a product with a particular manufacturer as readily as they do a trademark or a product-packaging trade dress.").

Our primary reviewing court has instructed as follows for petitions to cancel on the ground that a mark is not inherently distinctive and has not acquired distinctiveness:

> In a Section 2(f) case, the party seeking cancellation bears the initial burden to "establish a prima facie case of no acquired distinctiveness." [*Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1004 (Fed. Cir. 1988)]. To satisfy this initial burden, the party seeking cancellation must "present sufficient evidence or argument on which the board could reasonably conclude" that the party has overcome the record evidence of acquired distinctiveness—which includes everything submitted by the applicant during prosecution. *Id.* at 1576-77. The burden of producing additional evidence or argument in defense of registration only shifts to the registrant if and when the party seeking cancellation establishes a prima facie showing of invalidity. The Board must then decide whether the party seeking cancellation has satisfied its ultimate burden of persuasion, based on all the evidence made of record during prosecution and any additional evidence introduced in the cancellation proceeding.

*Cold War Air Museum Inc. v. Cold War Air Museum Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1630 (Fed. Cir. 2009); *see also Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1764 (TTAB 2013), *aff'd per curiam*, 565 F. App'x 900 (Fed. Cir. 2014).

Here, Grote has presented a persuasive argument that Truck-Lite's evidence of acquired distinctiveness is inadequate. Stop/turn/tail lights serve crucial non-source-identifying purposes, including increasing visibility and showing when a vehicle is stopping or turning.[40] The record shows that numerous third parties make the same type of goods serving the same purpose with various LED patterns, including a design very similar to the Penta-Star Pattern offered by a third party, Heavy Duty Lighting.[41] Having considered all the record evidence of acquired distinctiveness, including everything submitted by Truck-Lite during prosecution, we find these arguments and evidence sufficient to rebut the registration's presumption of validity.

As for the opposition proceeding, because the case has been completely tried, the only issue relevant to the outcome is whether, on the entire record, Truck-Lite has established the requisite acquired distinctiveness to support registration of its mark. *Yamaha*, 6 USPQ2d at 1004, 1010; *Target Brands Inc. v. Hughes*, 85 USPQ2d 1676, 1680 (TTAB 2007).

Thus, we proceed to review the entire record pertaining to acquired distinctiveness of the Penta-Star Pattern. *Cold War*, 92 USPQ2d at 1630. This includes all evidence made of record during prosecution of the subject application and application Serial No. 77171113, which matured into the subject registration, Trademark Rule

---

[40] *See* n.1 *supra*.

[41] *See* Hernandez Test. at 56:18-59:6, 85 TTABVUE 56-59; Grote Trial Exhibits 38, 55, 60, 108-09, 89 TTABVUE 372-73, 422, 446-53, 650-54; *see also* Truck-Lite Trial Exhibit NN, 130 TTABVUE 149-56. The exhibits include a copy of a cease-and-desist letter Truck-Lite sent to Heavy Duty regarding the design, but Truck-Lite states in its brief that Heavy Duty "will not comply with Truck-Lite's demands to cease and desist while these proceedings are pending, because these proceedings put the validity of Truck-Lite's trade dress rights in question." Truck-Lite Brief at 46, 138 TTABVUE 47.

2.122(b)(1), as well as all additional evidence properly submitted at trial of this consolidated proceeding. *Cold War*, 92 USPQ2d at 1630.

Grote's pleading for its claim of lack of acquired distinctiveness included an allegation that Truck-Lite's design "has not acquired distinctiveness over the period of its use in commerce." Amended Petition for Cancellation at 20 ¶ 111, 5 TTABVUE 21. Truck-Lite's assertion in the cancellation proceeding that the relevant date instead is April 2008, when the application that matured into the subject registration was approved for publication, is incorrect in this proceeding. *See* Truck-Lite Brief at 46, 138 TTABVUE 47. In a cancellation proceeding, acquired distinctiveness may be determined at the time of registration or trial. As the Board explained in *Neapco Inc. v. Dana Corp.*, 12 USPQ2d 1746, 1747 (TTAB 1989):

> In most cases, the time period of primary concern is the time when the registration issued. If a petitioner can establish that at that time, the registered mark was merely descriptive, then it is incumbent upon the registrant to establish that prior to the issuance of the registration, the registered mark had acquired a secondary meaning in the sense that its primary significance was that of a source indicator of goods emanating from registrant. (footnote and citations omitted). Thus, even if there is agreement that, at present, the registered mark possesses secondary meaning, the petitioner would nevertheless prevail if it is established that as of the time of registration, the mark was merely descriptive and was devoid of secondary meaning. . . .
>
> We should also add that it is permissible for the petitioner to also plead that the registered mark *currently* is merely descriptive and that the mark *currently* lacks a secondary meaning. If the petitioner were to so plead and were to establish that the registered mark is currently inherently merely descriptive, then the burden would be on the registrant to show that the mark currently has a secondary meaning in the sense that it functions primarily as a source indicator of goods emanating from the registrant.

> In sum, if it is established *either* that as of the time of registration, the registered mark was merely descriptive and lacked a secondary meaning, *or* that as of the present time, the mark is merely descriptive and lacks a secondary meaning, the cancellation petition would be granted. Of course, in the majority of cases, it is unlikely that a petitioner who is unable to make out a case of mere descriptiveness based on matters as they stood at the time of registration would be able to make out a case based on matters as they presently stand. This is because as the registrant makes more use of its mark with the passage of time, it is likely that secondary meaning will only increase, not decrease.

*See also Alcatraz Media*, 107 USPQ2d at 1764 (assessing merits of petitioner's claim that respondent's mark "lacked acquired distinctiveness at the time of registration or, alternatively, that it now is merely descriptive, i.e., that it lacked acquired distinctiveness at the time of trial"); *Kasco Corp. v. Southern Saw Serv. Inc.*, 27 USPQ2d 1501, 1506 n.7 (TTAB 1993) (stating that petitioner could prevail if record revealed claimed mark lacked acquired distinctiveness either at time of registration "or as of the present time"). On the facts of this case, we find that the proper timeframe to assess acquired distinctiveness is at the time of trial.

The prosecution file of the subject application includes two declarations from third parties.[42] Only one of the declarants, Richard Hewitt, was a purchaser of Truck-Lite's goods. *See Mag Instrument Inc. v. Brinkmann Corp.*, 96 USPQ2d 1701, 1723 (TTAB 2010), *aff'd mem.*, 2011 WL 5400095 (Fed. Cir. Nov. 9, 2011) (finding product configuration had not acquired distinctiveness and that 16 declarations submitted

---

[42] Declaration of Jeffrey Erion, March 22, 2010 Response to Office Action at TSDR 3; Declaration of Richard Hewitt, April 5, 2010 Supplemental Response to Office Action at TSDR 2.

during prosecution, only possibly one of which was from an end consumer, had little persuasive value); *Edward Ski Prods.*, 49 USPQ2d at 2005. There are also two declarations in the application file from Truck-Lite executives addressing consumer recognition of its design, which are self-serving and conclusory. *See, e.g.*, *In re Cent. Ctys. Bank*, 209 USPQ 884, 888 (TTAB 1981) (finding self-serving statements by applicant's officials concerning consumer recognition entitled to "little, if any, probative value on the registrability question"). The materials in the prosecution file have little persuasive value.

We find that the record, viewed in its entirety, contains insufficient probative evidence that the primary significance of Truck-Lite's design at the time of trial is to identify the source of its lights in the minds of consumers. Truck-Lite submits that: "All told, from introduction to the end of 2015, Truck-Lite has sold 13.8 million lamps incorporating the trade dress at issue in this case for $192 million dollars [sic]. These numbers are even higher now, as they do not account for sales in 2016." Truck-Lite Brief at 13, 42, 138 TTABVUE 14, 43. Truck-Lite attends 40 to 50 trade shows each year, and estimates that its print ads, catalogs, and website combined reach at least 400,000 customers per year. *Id.* at 42, 138 TTABVUE 43.[43]

Yet sales success alone is not probative of purchaser recognition of a configuration as an indication of source, because, without more, it may simply indicate popularity of the product itself rather than recognition of a mark. *See, e.g.*, *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 24 USPQ2d 1121, 1130 (Fed. Cir. 1992); *In re*

---

[43] Citing Ives Test. at 94:11-95:9, 137 TTABVUE 95-96.

*Bongrain Int'l (Am.) Corp.*, 894 F.2d 1316, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990); *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d at 1516 (citing *Stuart Spector Designs*, 94 USPQ2d at 1572). Nor do high sales and advertising figures always require a finding of acquired distinctiveness. What is needed – and what is missing from this record – is probative evidence demonstrating that the design presently serves as an indicator of source in the minds of the consuming public. *See, e.g.*, *In re Soccer Sport Supply Co.*, 507 F.2d 1400, 184 USPQ 345, 348 (CCPA 1975) ("The advertisements of record do not support an inference of distinctiveness inasmuch as the evidence fails to disclose information from which the number of people exposed to the design could be estimated—such as circulation of the publications in which the advertisements appear, advertising expenditures, number of advertisements published, volume of sales of the soccer balls, and the like."); *Goodyear Tire & Rubber Co. v. Interco Tire Corp.*, 49 USPQ2d 1705, 1720 (TTAB 1998).

Truck-Lite argues that: "Many in the vehicular lighting industry recognize a lamp with the Penta-Star Pattern as being a Truck-Lite lamp, and the trade dress has powerful source-identifying functions." Truck-Lite Brief at 43, 138 TTABVUE 44. It cites no supporting evidence except testimony from its own executive, Mr. Ives, that Truck-Lite continues to use the design even though current technology would allow it to use cheaper diode patterns.[44] *See id.* That testimony does not support the different factual assertion that Truck-Lite urges. Furthermore, the registration is not

---

[44] In testimony submitted under seal, Mr. Ives testified as to one consumer contact with the company that may have indicated recognition of the Penta-Star Pattern, but with insufficient detail to carry probative weight. *See* Ives Test. at 64:7-65:22, 80 TTABVUE 65-66 (confidential).

limited to purchasers "in the vehicular lighting industry." The description of goods and services has no such limitation. *See, e.g.*, *In re Meyer & Wenthe, Inc.*, 267 F.2d 945, 122 USPQ 372, 376 (CCPA 1959) ("It is incumbent upon the applicant to submit proof that its mark is distinctive, not only to 'experts' in the field, but to the purchasing public."); *In re Ennco Display Sys. Inc.*, 56 USPQ2d 1279, 1284 (TTAB 2000) ("The statements made by distributors concerning acquired distinctiveness are of minimal value because they are not the ultimate consumers of applicant's products."); *see also Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 59 USPQ2d 1720, 1730 n.14 (1st Cir. 2001) ("The opinions of retailers and distributors active in the scented candle field and extremely familiar with Yankee products is hardly evidence of whether the 'consuming public' forms the same association.").

Although Truck-Lite states that it submitted potentially crucial evidence of "'look for' advertising that directly calls attention to the trade dress in question and associates it with Truck-Lite," Truck-Lite Brief at 41, 138 TTABVUE 42, neither of the prosecution files nor the record as a whole contains any such advertising. "The Board and other courts have long taken notice of the importance of such advertisements in regard to configuration or product design marks." *Mag Instrument*, 96 USPQ2d at 1723; *see also In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 423-24 (Fed. Cir. 1985) (describing effective "look for" advertising); *In re Data Packaging Corp.*, 453 F.2d 1300, 172 USPQ 396, 398-99 (CCPA 1972) (example of effective "look for" advertising); *but cf. In re Burgess Battery Co.*, 112 F.2d 820, 46 USPQ 39, 40 (CCPA 1940) (despite some evidence that applicant used "look for" advertising, the consuming public will likely view repeating black-and-white

stripes on batteries to be ornamentation and not an indicator of source). The only

Truck-Lite ad in each of the two prosecution files follows:[45]



The ad shows the design and highlights that the goods have six diodes but does not

mention their configuration at all, much less inform consumers to "look for" the

pattern to identify a Truck-Lite product; nor does it otherwise promote the design as

a mark. *See* Ives Test. at 35:11-15, 86 TTABVUE 36 ("Q. [H]as Truck-Lite offered any

---

[45] Registration, Feb. 25, 2008 Response to Office Action at TSDR 9; Application, Aug. 27, 2009 Response to Office Action at TSDR 11.

marketing materials that say, look for the Penta-Star pattern so you'll know it's a Truck-Lite product? A. Not that I'm aware of.").

> "Look for" advertising refers to advertising that directs the potential consumer in no uncertain terms to look for a certain feature to know that it is from that source. It does not refer to advertising that simply includes a picture of the product or touts a feature in a non source-identifying manner.

*Stuart Spector Designs*, 94 USPQ2d at 1572.

The ad, moreover, prominently uses the TRUCK-LITE word mark. Seeing the ad *supra*, consumers are more likely to associate the word mark than the design with the source of the goods. *See In re Soccer Sport Supply Co.*, 507 F.2d 1400, 184 USPQ 345, 348 (CCPA 1975); *In re Mogen David Wine Corp.*, 372 F.2d 539, 152 USPQ 593, 595 (CCPA 1967); *cf. Apollo Med. Extrusion Techs., Inc. v. Med. Extrusion Techs., Inc.*, 123 USPQ2d 1844, 1855 (TTAB 2017) (finding applicant failed to establish secondary meaning in mark almost always used with acronym). Underscoring the significance of the TRUCK-LITE word mark, Truck-Lite's own Chief Technology Officer testified that he could tell the light in the exhibit shown at right was made by Truck-Lite because: "We have applied our logo."[46]



In sum, there is insufficient evidence in the record as a whole to show that the design by itself indicates source, or that consumers recognize it as such.

---

[46] Van Riper Test. at 19:6-20:13, 137 TTABVUE 302-03, concerning Grote Trial Exhibit 115, 89 TTABVUE 672-73. Testimony of other witnesses indicates that Truck-Lite also embosses the model name and mark SUPER 44 on the front of these lights. *See, e.g.*, John Grote Test. at 21:4-6, 84 TTABVUE 22; Ives Test. at 9:18-10:14, 86 TTABVUE 10-11.

VII.    Conclusion

We have carefully considered all arguments and evidence properly of record, including any not specifically discussed herein. Considering the record evidence as a whole, we conclude, based on the preponderance of the evidence, that Truck-Lite's product configuration is not functional, but Truck-Lite has not established that its configuration has acquired distinctiveness and therefore serves as an indicator of source.[47]

**Decision**: The petition to cancel Registration No. 3483147 is granted, and the opposition to application Serial No. 77618319 is sustained.

---

[47] Because we find that Truck-Lite's product configuration has not acquired distinctiveness, we need not address Grote's fraud claim. *See Azeka Bldg. Corp. v. Azeka*, 122 USPQ2d 1477, 1478 (TTAB 2017) (stating that the Board has "'discretion to decide only those claims necessary to enter judgment and dispose of the case,' as our 'determination of registrability does not require, in every instance, decision on every pleaded claim'") (quoting *Multisorb Tech., Inc. v. Pactiv Corp.*, 109 USPQ2d 1170, 1171 (TTAB 2013)).